Russell *v.* Southeastern Utilities Service Co., et al.

No. 40399 February 18, 1957 92 So. 2d 544

*Travis & Moore,* Jackson, for appellant.

*Watkins & Eager,* Jackson, for appellee.

ETHRIDGE, J.

This is a workmen's compensation case. The precise question is whether there was substantial evidence to support the finding of the Workmen's Compensation

Commission that claimant-employee suffered a fifty per-
cent loss of wage-earning capacity as the result of in-.
juries which arose out of and in the course of his em-
ployment by Southeastern Utilities Service Company.

The pertinent statute is Code of 1942, Section 6998-09
(c) (21): "Other cases: In all other cases in this class
of disability, the compensation shall be sixty-six and two-
thirds per centum (66 2/3%) of the difference between
his average weekly wages, subject to the maximum
limitations as to weekly benefits as set up in this act,
and his wage-earning capacity thereafter in the same
employment or otherwise, payable during the continu-
ance of such partial disability, but subject to reconsidera-
tion of the degree of such impairment by the commis-
sion on its own motion or upon application of any party
in interest, and such payments shall in no case be
made for a longer period than four hundred fifty (450)
weeks."

Russell is fifty-one years of age, and has been en-
gaged in electrical construction work for about twenty-
five years. He was a lineman, and a member of Local
605, International Brotherhood of Electrical Workers.
Companies constructing electric lines made contracts
with this union, by which, when the company had a
project, it would notify the union of how many foremen,
linemen, and ground-crew helpers it would need. The
union, through its officers, would then furnish to the
company the classified personnel for the job. A line-
man's job necessitates considerable physical strength,
and involves climbing up and down poles, installing
electric wires, and other related duties. A lineman car-
ries about fifty pounds of extra equipment.

Russell had been working for Southeastern for about
a year prior to his injury on July 20, 1950. He was on a
pole performing his duties for Southeastern when he
came in contact with a transmission line of 13,000 volts.
He was in extreme shock, and received severe burns on

the trunk, both arms, and his back. His deepest burns involved the chest wall and the right forearm around the elbow. There was considerable muscle and tendon destruction. Dr. W. A. Hull, who treated Russell, testified that he reached the maximum possible recovery on May 20, 1951. He said that, with reference to claimant's work as a lineman, he was one hundred percent disabled; that he has a forty percent permanent loss of function in the right forearm, and a thirty percent permanent loss of function in his left shoulder. Dr. Hull estimated that Russell has a twenty percent functional disability to his body as a whole.

Before his injury appellant was earning $2.25 an hour as a lineman. In the latter part of November 1950 he returned to work, performing light duties as a helper for a ground crew, earning $1.48 an hour. He remained at this job until July 30, 1951. He was then promoted from a helper to foreman, and was paid a foreman's wage which was $2.75 an hour, or fifty cents per hour more than he earned as lineman. This was the standard differential between wages of linemen and foremen. In May 1952, hourly wages were increased for linemen to $2.50 and for foremen to $3.00.

H. D. Williams, assistant business manager of Local 605, assigned members of the union to electrical construction jobs when a construction company with which the union had a contract requested a crew. He was familiar with the capacities of the men. Williams testified that after his injury Russell was not physically qualified to do line work. For seven or eight months he was classified as a ground man, earning considerably less than a lineman. He said that the principal reason why Russell was made a foreman and assigned as such by the union was that he was not able to do line work, and that they figured he could probably run a crew as a foreman. "It was either that or put him on the bench," and in that event he could not do any work. Williams

said that he had quite a bit of trouble sending Russell out as a foreman. He detailed numerous instances in which employers, including Southeastern, complained about Russell's work as a foreman. Employers said claimant did not know how to lay out work, could not get production, and the men complained that he made them climb too much. Williams said that Russell could work as a foreman if he had a crew of men who could do the job without supervision. On several occasions construction companies refused to accept appellant as a foreman. At other times employers discharged or fired him as foreman for not being qualified; and on at least two of those jobs the union went on strike in order to protect Russell's job. Williams said he had complaints every time he sent Russell out as a foreman.

Appellant's testimony is to the same effect. He detailed the numerous instances during the more than four years since he became a foreman in which he had been either discharged from jobs or his employers had complained about his lack of qualifications. He said he worked hard, and that a foreman's job did not bother him physically. The only basis of complaints which he could think of was that perhaps he was nervous as a result of the electric shock. It was not unusual for a man of his experience and age to be promoted to foreman. But Williams said that, in the absence of the union's influence and assignment rights, Russell would have had only one chance as a foreman, and if he failed that, he would not get another; and that, in his opinion, Russell was wholly unqualified to work on that level.

Otis R. Combs, Mississippi superintendent for Southeastern, said that in his opinion Russel was physically able to do the work of foreman. He did not know the reason for Russell's difficulties. Southeastern discharged him on one occasion as being unqualified. Combs said that there was ''evidently one phase'' of Russell's work

as a foreman that he was qualified to do, but he did not identify what it was.

Since Russell was promoted to foreman by his union on July 30, 1951, he has continued to work at various times on construction jobs in that capacity, and was so working at the time of the hearing. There has been a general wage increase for linemen and foremen as a result of contract negotiations and economic conditions, as previously stated. Claimant has been employed a majority of the time since reaching maximum possible recovery about as much as the average foreman. Williams testified, in effect, that Russell was qualified only to work as helper to a ground crew; that on the open labor market he would not be fit to work as a foreman; and that he continued to get work because of the union's efforts in procuring employment for him. It was the desire of the union to give him every chance it possibly could. Williams said that in the future, with less electric work available, it will be more difficult to place a foreman who is not qualified to work as such in all types of jobs and with various crews.

Appellees considered Russell's injuries to be scheduled disabilities, so, after the payment of temporary total and temporary partial benefits, appellees paid him permanent partial disability benefits at the rate of $25 per week for one hundred and forty weeks, from November 8, 1951, to July 8, 1954.

On June 17, 1955, appellant filed this claim for additional compensation. This was approximately four years after he reached maximum possible medical recovery. During that intervening period, and up to the time of the hearing on September 7, 1955, Russell worked as a foreman under the circumstances outlined above. His earnings for the twelve months preceding the injury were $4,123.38. His earnings for the year 1951 were $3,546.47. In 1952, he earned $4,219; in 1953, $4,451.02; in 1954, $3,948; and for the first eight months in 1955,

up to the date of the hearing, he earned $3,209.43. Hence for three out of the five years subsequent to his injury Russell has earned slightly more than he earned prior to the injury.

The attorney-referee found that as a result of the injuries, claimant's wage-earning capacity in the same employment or otherwise was reduced fifty percent; that claimant's average weekly wage was $90 per week, and he now has a wage-earning capacity of $45 per week. He ordered that appellees pay appellant permanent partial disability benefits based on such loss in earning capacity, at the rate of $25 per week from May 20, 1951, for a period not to exceed four hundred and fifty weeks or $8,600, whichever shall be the lesser in amount. The Commission unanimously affirmed the attorney-referee. The Circuit Court of Sunflower County held that there was no substantial evidence to support the Commission's finding of a loss of wage-earning capacity. It reversed the Commission's order and rendered judgment for appellees.

Appellees first contend that claimant's only permanent injuries are scheduled disabilities to the right and left arms. However, all of the evidence is to the contrary. Appellant suffered a twenty percent disability to his body as a whole. In addition to extensive damage to his arms, the muscles in his chest, left shoulder and back were permanently damaged. Hence appellees erroneously concluded that appellant sustained only scheduled injuries. His disabilities necessarily must come under Code Section 6998-09 (c) (21).

The question is whether there is substantial evidence to support the Commission's finding that claimant suffered a fifty percent loss in "wage earning capacity." We think there is.

■ ■ The statutory test is calculated by comparing actual earnings before the injury with earning capacity after the injury. The two items are not the same. Karr

.v. Armstrong Tire & Rubber Company, 216 Miss. 132, 61 So. 2d 798 (1953). The Commission was warranted in finding that appellant's average weekly wages for one year prior to his injury were $90. Code Section 6998-16. ██ █ Earning capacity is a more theoretical concept. The test is one of capacity. The trier of fact, the Commission, must make the best possible estimate of future impairment of earnings, on the strength of both actual post-injury earnings and any other evidence of probative value on the issue of earning capacity. This is essentially a question of fact for the Commission.

2 Larson, Workmen's Compensation law (1952), Section 57.21, states the recognized approach to this problem, as follows: "It is uniformly held, therefore, without regard to statutory variations in the phrasing of the test, that a finding of disability may stand even when there is evidence of actual post-injury earnings equalling or exceeding those received before the accident. The position may be best summarized by saying that actual post-injury earnings will create a presumption of earning capacity commensurate with them, but the presumption may be rebutted by evidence independently showing incapacity or explaining away the post-injury earnings as an unreliable basis for estimating capacity. Unreliability of post-injury earnings may be due to a number of things: increase in general wage levels since the time of accident claimant's own greater maturity or training; longer hours worked by claimant after the accident; payment of wages disproportionate to capacity out of sympathy to claimant; and the temporary and unpredictable character of post-injury earnings."

██ █ Of course earnings equal to pre-injury earnings are strong evidence of nonimpairment of earning capacity. However, this is not conclusive. It is a rebuttable presumption, which may be removed by the various factors referred to above. This Court first held

to that effect in Karr v. Armstrong Tire & Rubber Co., supra. Later cases in accord are Elliott v. Ross Carrier Company, 220 Miss. 86, 70 So. 2d 75 (1954); Mississippi Products v. Gordy, 80 So. 2d 793, 797 (Miss. 1955); Port Gibson Veneer & Box Company v. Brown, 83 So. 2d 757, 761 (Miss. 1955); Ebasco Services v. Harris, 85 So. 2d 784 (Miss. 1956); and King v. Westinghouse Electric Corporation, No. 40,311, decided Jan. 21, 1957. See also 58 Am. Jur., Workmen's Compensation, Sections 284, 285.

 Here the rebutting evidence attacked the post-injury wage itself, and clearly showed that its size is an unfair criterion of the earning capacity of appellant. His post-injury earnings for slightly more than four years after his maximum possible medical recovery have equaled or slightly exceeded his pre-injury earnings for three out of four years. But it is clear that Russell kept his job as foreman only because of the sympathy and strenuous efforts of his union and the sufferance of his employers. He is not qualified to work as a foreman. Every employer which worked him as a foreman complained to the union that he was not qualified. He has continued to be assigned only because his union out of sympathy has undertaken to protect his income. In fact, on this record appellant is qualified to perform only the job of helper to a ground crew, at a considerable reduction in wages; no doubt the Commission so thought in reaching its conclusion concerning his loss of earning capacity.

Russell has proved permanent and substantial physical injuries. We cannot say that the Commission erred in finding that he has undergone an impairment of earning capacity. During the period of his post-injury earnings, there has been an increase in general wage levels. Claimant's age and past experience put him in a position where he might be promoted to foreman, if qualified. The temporary and unpredictable character of his

post-injury earnings is pointed up by the testimony of Williams that Russell in a normal labor market would not be able to hold a foreman's job; he could not without the strenuous help of the union exercising its assignment powers. In other words, the Commission was warranted in finding that Russell has been paid wages disproportionate to his earning capacity, because of the influence and sympathy of the union, and the sufferance of his employers; and that he has suffered a fifty percent loss in earning capacity.

Hence the circuit court erred in reversing the order of the Commission, so its judgment is reversed, and the Commission's order is reinstated and affirmed, and the case remanded for further proceedings consistent with this opinion.

Judgment of circuit court reversed, order of Commission reinstated and affirmed, and case remanded.

*Roberds, P. J.,* and *Lee, Holmes* and *Arrington,* JJ., concur.

ON MOTIONS FOR ATTORNEYS' FEES, INTEREST AND DAMAGES.

██ ██ Appellant's motion for the allowance of attorneys' fees is sustained, and the same are fixed at 33⅓ percent of all compensation recovered, for all services rendered by counsel for appellant.

██ ██ Appellant's motion for 6 percent interest is sustained to the extent that each weekly installment of compensation shall bear interest at the rate of 6 percent per annum from its due date until paid. M. T. Reed Construction Co. v. Martin, 215 Miss. 478, 63 So. 2d 528 (1953); J. & B. Manufacturing Co. v. Cochran, 216 Miss. 336, 62 So. 2d 378 (1953).

██ ██ Appellant has also moved for the allowance of 5 percent statutory damages under Code of 1942, Section 1971. However, that statute allows damages only where this Court affirms a decision of the trial court.

Here the judgment of the circuit court was reversed, so damages under Section 1971 are not allowable. That motion of appellant is overruled.

Motion for allowance of attorneys' fees sustained; motion for 6 percent interest on each weekly installment from due date until paid sustained; and motion for 5 percent statutory damages overruled.

All Justices concur except *Holmes, J.,* who took no part.