598 So.2d 760 (1992)
Frances Lou RAY
v.
MISSISSIPPI STATE BOARD OF HEALTH AND COMMERCIAL Union Insurance Company.
No. 90-CC-1088.
Supreme Court of Mississippi.
April 8, 1992.
*761 Roy O. Parker, Roy O. Parker & Associates, Tupelo, for appellant.
Robert K. Upchurch and Thomas A. Wicker, Holland Ray & Upchurch, Tupelo, for appellee.
En Banc.
PRATHER, Justice, for the Court:
This workers' compensation case is an appeal from the Tippah County Circuit Court denying to Frances Lou Ray permanent partial disability benefits, but ordering the Mississippi State Board of Health, the employer, and its carrier, Commercial Union Insurance Company, to pay Frances Lou Ray for all reasonable and necessary medical expenses incurred as a result of her job-related injury.
Frances Lou Ray was employed as a home health aide by the State Board of Health, through the Tippah County Health Department. Ray's position paid $157.30 per week. On August 3, 1982, Ray first suffered an injury to her back in the home of a patient while attempting to move a patient from his bed to a wheelchair. Ray received medical attention for this first injury and returned to work October 14, 1982. As compensation for her injury, Ray received $1,692.00 in temporary total disability benefits.
Ray returned to work in October of 1982, but reinjured her back on March 10, 1983. Ray again received medical attention, but this time was unable to return to work without pain and discomfort. As a result, Ray's employment with the Board of Health was terminated in August of 1983.

I.

Procedural History
On May 23, 1984, Ray filed a petition to controvert with the Mississippi Workers' Compensation Commission against the State Board of Health, employer, and its insurance carrier, Commercial Union Insurance Company, for permanent disability. A hearing was held before an administrative judge on September 19, 1985, and at the hearing Dr. Tommy Simpson, Ray's physician, testified of Ray's back injuries and was of the opinion that Ray had reached maximum medical improvement on January 1, 1985, and was fifteen to twenty percent permanently disabled. The administrative *762 judge also considered the deposition of Dr. Jerry Engelberg, whose testimony as to Ray's physical condition was similar to that of Dr. Simpson.
Ray testified about her injuries in 1982 and 1983 and of her job termination because of her inability to perform her job. She testified that she had been gainfully employed to "sit" with an elderly lady for approximately four months for $90.00 per week. She had quit her job with this lady and had begun caring for an elderly gentleman named Trammel McCown. Ray initially attended McCown in his home, but later he moved into her home when his condition worsened. Ray did no lifting or bathing of McCown because of the back pain. McCown promised Ray, in return for keeping him, that upon his death she would take by will "what he has." No accurate value could be given to McCown's assets at the hearing.
Ray testified that during the period that she cared for McCown, she received no money for any type of work or employment. However, Ray had access to McCown's social security check of $223 per month for McCown's expenses. Ray was given power of attorney to handle McCown's financial affairs and write checks from his personal bank account.
On February 10, 1986, the administrative judge ordered that the State Board of Health and Commercial Union pay for the first back injury: all reasonable and necessary medical expenses as a result of the injury on August 3, 1982; pay to Ray temporary total disability benefits at $101.47 per week for the period of August 3, 1982, to October 14, 1982, receiving credit for any such payments already made. As to the second back injury, they were ordered to pay all medical services incurred as a result of the March 10, 1983, injury; and to pay temporary total disability for the period of March 10, 1983, to October 1, 1984, at a rate of $101.47 per week and to pay Ray permanent partial disability benefits at $41.47 per week, beginning January 1, 1985, and continuing for a 450 week period. The permanent partial disability holding was based on Ray's testimony and medical witnesses.
On March 10, 1986, the State Board of Health and Commercial Union Insurance Company filed a petition for review by the Full Commission. The Full Commission reviewed the case on October 20, 1986, and affirmed the order of the administrative judge which allowed permanent partial disability to the claimant.
On November 4, 1986, a motion to reopen was filed by the State Board of Health and Commercial Union with the Workers' Compensation Commission, asserting a change in conditions due to the death of Trammel McCown, who died on October 7, 1986. The employer and its carrier contended that because of McCown's death, Ray now enjoyed McCown's bequest, the exact value of which had not been known at the time of the hearing by the administrative judge. On November 14, 1986, the Commission sustained the motion to re-open.
At the re-opened hearing before the administrative judge, Ray detailed how she cared for McCown, fixing his meals, giving him medication, and their financial arrangements. McCown told Ray that he would devise her "all he had" because he did not want any of his nieces or nephews to have it. Ray testified that McCown did not offer to leave her the property in exchange for her taking care of him. She testified at the previous hearing that they had reached an agreement.
Ray testified that through the power of attorney granted to her, she used McCown's social security check of $223 per month and his personal checking account to take care of his living expenses and some of her own. McCown bought Ray a $4,300 car and paid off a $900 debt for her.
Ray was questioned about McCown's assets. She stated that aside from the 70 acres of land, he owned twenty-one (21) shares of stock in the Bank of Falkner, that he had very little cash, two certificates of deposit valued at $20,000 and $30,000 respectively. Some of the money from the certificates had been used for hospital bills, funeral expenses, and a new car for herself. The money that was not used for *763 funeral expenses and hospital bills belonged to Ray.
Another hearing was held on February 15, 1989, for further cross-examination of Ray. Ray testified that she sold the real property that she inherited from McCown for $22,000, roughly $300 per acre. Ray also sold an automobile that at one time belonged to McCown for $400. The twenty-one (21) shares of stock were sold at $250 a share. There was also the $39,000 from the two certificates of deposits. McCown had very little money in his checking account at the time of his death.
Ray was questioned about her medical expenses of $12,414.46 that remain unpaid. It appeared that some of the expenses were for an injection of Nubain of Phenergan at $12 per visit. At a previous hearing, Ray testified that the shots were the only thing that would completely relax her back. Dr. Walter Eckman, a neurosurgeon who looked at the records of Ray, testified in his deposition that injections would not cure Ray's injuries.
On July 17, 1989, the administrative judge issued his order addressing the question of whether Ray's receipt of McCown's bequest in return for nursing care would be contrary to the finding of the loss of wage earning capacity made in the first order and whether Ray's medical care received was reasonable and necessary. The administrative judge found that McCown did promise Ray his estate in exchange for nursing care, but that because of the speculative nature of the promise, it could not result in wages or post-injury earnings as defined by the Mississippi Workers' Compensation Act. He also found that Ray's injections were reasonable and necessary medical expenses. The administrative judge readopted the order issued on February 10, 1986, and the amended order issued on March 6, 1986.
The State Board of Health and Commercial Union petitioned for review by the Full Commission. On February 12, 1990, the Full commission held that:
The record reveals claimant's attendant care for Mr. McCown included every aspect, duty and responsibility she was performing while in the employ of defendant. The care claimant provided McCown required her to lift and turn her patient, bath and feed him as well as all other physical demands incidental to attending a patient as incapacitated as McCown. The record reveals claimant not only did a commendable job in her care and treatment of McCown, it was exemplary.
The Commission found further that:
McCown executed his will on June 29, 1984, leaving his entire estate to claimant. He died October 7, 1986. Claimant proceeded to liquidate his estate whereupon she received approximately $66,650.00 therefrom.
The Commission based its decision entirely upon the term "the capacity to earn wages". Section 71-3-3(i) of the Mississippi Code of 1972, as amended defines disability as follows:
"Disability" means incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or other employment, which incapacity and the extent thereof must be supported by medical findings.
Upon reading the foregoing, the casual reader may conclude that the Commission has lost its way in developing the rationale of their decision in the case sub judice. The Commission will restate the fact that it does not consider the proceeds claimant received through liquidation of the McCown estate as wages within the meaning of the workers' compensation law. However, in a proper consideration of long standing law concerning pre-injury/post-injury earnings, one can draw the conclusion of an injured worker's ability or capacity to earn wages. Wages, as used within the context of workers' compensation law, would provide interested parties a means or source of measurement of an injured worker's capacity to earn wages. The record in the instant case provides substantial evidence for the commission to determine claimant's capacity to earn wages notwithstanding the liquidated assets *764 of the McCown estate is not considered wages. Claimant was required to use physical ability, as well as her training and skill, to care for McCown. Claimant opted to care for McCown rather than return to the employ of the defendant, or a similar health care provider and earn a wage paid for health care service.
... .
If claimant had chosen to return to work for a wage with defendant, or any other health care provider, there would be no mystery concerning claimant's post-injury earnings. Instead claimant chose to care for McCown for a promise by him to leave her his entire estate, the exact value of which was unknown at the time of the promise or at the time of his death. Such promise was speculative in nature and could not result in wages and/or post-injury earnings as defined by the workers' compensation law, but quite clearly, claimant chose to risk that McCown's estate at his death would be worth her efforts on his behalf.
The Commission reversed the part of the order awarding Ray permanent partial disability benefits and affirmed it in regard to the medical expenses. The Commission found that she exhibited wage earning capacity although not considering her inheritance "wages."
Ray appealed the order of the Full Commission dated February 12, 1990, denying Ray permanent partial disability to the Tippah County Circuit Court, asserting that the Commission was without any evidence to reverse its position taken in the March 10, 1986, order. The State Board of Health and Commercial Union cross-appealed on the finding that the medical expenses were reasonable and necessary. On August 30, 1990, the Tippah County Circuit Court affirmed the findings of the Full Commission as being without error of law or fact.
Ray appeals the decision of the Circuit Court affirming the denial of permanent partial disability benefits to this Court. The claimant seeks reinstatement of the first holding of the Commission of October 1986. The claimant's position on this appeal is that she is physically unable to perform the duties of a home health aide. In her "sitting" jobs, although requiring constant care, she did not perform physical work because of her alleged permanent disability. Her son did this physical work for her. The State Board of Health and Commercial Union cross-appeal the granting of the payment of medical expenses as reasonable and necessary.

II. DISCUSSION

A. STANDARD OF REVIEW
This Court reviews the decision of the Workers' Compensation Commission within a limited scope, as it considers only whether there is substantial evidence to support the findings of the Workers' Compensation Commission. The findings of the Commission will be reversed by an appellate court only if the findings are clearly erroneous and contrary to the overwhelming weight of the evidence. Morris v. Lansdell's Frame Co., 547 So.2d 782, 784 (Miss. 1989), quoting Fought v. Stuart C. Irby Co., 523 So.2d 314, 317 (Miss. 1988); compare Olen Burrage Trucking Co. v. Chandler, 475 So.2d 437 (Miss. 1985). If the findings are supported by substantial evidence, then they are beyond the power of this Court to disturb.

B. WHETHER RAY HAD THE CAPACITY TO EARN WAGES?
Although there are numerous proceedings discussed here, this Court notes that the Administrative Judge and Full Commission awarded permanent partial disability February 10, 1986, on the evidence of Ray's termination from employment with the Board of Health and on her inability to perform her job. Both administrative hearings contained evidence of Ray's inability to lift McCown and perform the physical activities necessary to be a Home Health Aide. The evidence showed that her son and others performed these physical tasks. *765 Permanent partial disability was awarded and affirmed on appeal by order of October 20, 1986.
The employer requested and received permission to reopen the case after McCown's death and Ray's receipt of her inheritance. On the reopening of the case, the Administrative Judge heard no additional proof on Ray's incapacity, but heard only the details of her inheritance from McCown. The administrative judge found that the receipt of the estate "could not result in wages and/or post-injury earnings as defined by the [MWC] Act"; thus, the judge readopted the findings of its order of February 10, 1986, awarding permanent partial disability.
On the employer's appeal of the second order of the administrative judge's awarding of permanent partial disability, the Full Commission found that Ray's "attendant care for McCown included every aspect, duty, and responsibility that she was performing while in the employ of the [Board of Health]. The care claimant provided McCown required her to lift and turn her patient, bath [sic] and feed him as well as all other physical demands incidental to attending a patient as incapacitated as McCown." However, the testimony in the record does not support by substantial evidence this conclusion; rather, it is contradicted by it. The evidence pertaining to Ray's health was considered only in the February 6, 1986, order when Ray said she could not and did not perform any physical activity. A summary is attached as Exhibit "A" to this opinion. This Court concludes that there is no factual basis for the Commission to reverse its previous award of permanent partial disability. Not only is there an absence of substantial evidence, there is an absence of any evidence that Ray could perform the physical requirements of a home health aide. Under our substantial evidence standard of review, the Commission's order of March 5, 1990, denying permanent partial disability benefits is reversed, as well as the Circuit Judge's order affirming the Commission's order. Marshall Durbin, Inc. v. Hall, 490 So.2d 877 (Miss. 1986). The Commission order of October 20, 1986, is reinstated.

C. WHETHER MEDICAL EXPENSES WERE REASONABLE AND NECESSARY?
The State Board of Health and Commercial Union in their cross-appeal assert that the Commission erred in finding that the medical expenses for the cost of injections of pain medication incurred were reasonable and necessary. The defendants rely heavily on the deposition of Dr. Walter Eckman, who stated that the pain medication was not a cure for Ray's back problems and carried the risk of dependency. Dr. Eckman never actually examined Ray, but offered his opinion from an examination of her records.
Ray testified that the injections were the only way she could get relief. The shots were given primarily to ease her pain and discomfort. Two doctors, Dr. Jerry Engelberg and Dr. Tommy McDonald, examined Ray and could not understand why her back hurt. However, Dr. Simpson testified that Ray had a chronic back problem and sustained pain; thus the injections of pain medication were necessary.
The record supports the Commission's finding by substantial evidence that the injections were reasonable and necessary. Ray was experiencing pain and the injections were administered to provide her with a measure of relief. This assertion on cross-appeal is without merit.

CONCLUSION
Because there was a lack of substantial evidence to reverse its previous award of permanent partial disability, the Workers' Compensation Commission's order of February 12, 1990, is reversed and rendered as to the disallowance of Ray's permanent partial disability award. The February 12, 1990, order of the Commission allowing medical benefits is affirmed as properly allowed. Following this determination, the *766 Tippah County Circuit Court order is affirmed relating to medical expenses and reversed on denial of permanent partial benefits.
ON DIRECT APPEAL, AFFIRMED IN PART, AND REVERSED IN PART; ON CROSS-APPEAL, AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and ROBERTSON, SULLIVAN, PITTMAN, BANKS and McRAE, JJ., concur.
DAN M. LEE, P.J., concurs in result only.
McRAE, J., concurs by separate written opinion, joined by HAWKINS, P.J.

EXHIBIT "A"

TESTIMONY OF FRANCES LOU RAY

9/19/85 Hearing Date
Q. Do you do anything like lifting him or bathing him?
A. No I do not.
Q. Taking care of his personal needs?
A. No.
Q. Who does that?
A. The aide from the Health Department comes out three times a week and gives him bath and changes his bed and shaves him and provides the personal care that he needs.
(RE. 28, L 24-27)
(RE. 29, L 1-6)
Q. Do you have anybody else that stays with you in the home?
A. My son.
Q. Okay. Does he do anything around the house for you, your son?
A. Yes, he does.
Q. Does he help with this elderly gentlemen that stays at home with you?
A. Yes, he does.
(RE. 30, L 7-15)
Q. And in connection with  I take it that he is bedridden?
A. Yes, he is.
Q. And that, therefore, he would have to use a bedpan?
A. Yes, he does.
Q. And certainly he doesn't wait three days before you would help him with that?
(RE. 32, L 20-27)
A. My son helps him.
Q. Well, are you telling us that you never help him with that?
A. Not with the lifting and all, no.
Q. You don't help him if he needs to have a bowel movement? You don't help him: If your son's not there you just leave him?
A. No, that has not come up yet, as a matter of fact. My son has always been there. I've never had to face that.
Q. But you would certainly help him if that need arose?
A. I would certainly get him some help.
Q. He has a home health care nurse that comes and bathes and shaves him three times a week?
A. Yes.
Q. And other than that do you feed him?
A. He feeds himself.
Q. All right. And do you change his pajamas or gown or whatever for him?
A. I change his hospital gown occasionally.
Q. Well, once a day or 
A.  No, just between times that the health aid is there.
Q. And is this the type gown that ties in the back?
A. Yes, it is.
(RE. 33, L 1-27)
Q. And that requires you to bend over the bed?
A. No, it does not.
Q. You're able to do that from a standing position?
A. Yes, I am with his head raised.
Q. Is he in a hospital bed?
A. Yes, he is.
*767 Q. And you can put that gown on without bending over?
A. Yes, I can.
Q. What other things do you do for him?
A. Well, he has false teeth. I brush his teeth, and just fix his meals, and do his laundry.
Q. Do you change his bed?
A. No, the nurse does that. The aide does that from the Health Department.
(RE. 34, L 1-16)
Q. You testified previously that if there was any lifting that your son would help you do the lifting; is that correct?
A. That's correct.
Q. All right. Now, how long has that been true or was that true after Mr. McCown came to live with you?
A. This was  well, he didn't require any lifting, you know, until he came to live with me, and my son has been there the whole time.
Q. Are you aware that there is an emergency room record which indicates that on June 22, 1985, you were seen at the emergency room with a history of your back and hips hurting you? And the history given was that you had picked up a patient at home and now you had severe pain across the posterior pelvis. Are you aware of that report?
A. Yes, I am.
Q. Can you explain that, please?
A. Yes, I can. At the time Mr. Trammel was able to maneuver himself, like from the bed to the chair, anything of this nature. And I took him to the bathroom. He got out of the chair and sat on the commode. And he
(RE. 34, L 6-27)
got a little sideways on the commode and he slipped. He just slipped off the commode and just automatically I reached down, you know. Just a reflex, I reached down to help him up and that was 
Q.  you set off your back again?
A. Yes, I did. But I had to call my son home from work.
Q. Do you have a spasm in your back when that happens?
A. Yes, I do.
Q. It just tightens up?
A. Yes, it does.
Q. And the only way you can relieve that, then, is just to rest and get the muscle relaxer?
A. Yes, sir.
Q. And it takes more than just the capsule. Sometimes you have to have the injection, too; is that right?
A. The injection, it's got to where about the injection is about the only thing now that will completely relax it.
Q. Now, it really doesn't take much to set that off, does it?
A. No, it does not.
Q. I noticed in August 1984, August the 30th to be exact, you had gone back to the hospital with "an acute twist of the back today." Do you recall that incident
(RE. 36, L 1-27)
when you went back on August 30, 1984? Would you like to see that? It's Exhibit 7.
A. I can't recall the date; but, now, that might have been when I stepped out of the bathtub. When I started to step out of the bathtub, one foot kind of slipped a little and it kind of got me in a twist.
Q. And that set off the spasm and exacerbation of your back?
A. Yes.
Q. Any you had to have medical treatment for that?
A. Yes, I did.
Q. Were you generally improving you think, Ms. Ray, until that happened in August 1984? Had you been improving along?
A. Yes, I would say that I had improved some.
Q. Had there ever been times following March '83 that you thought you were improving until maybe you reached down to pick up some dirty clothes or something and that thing hit your back again just by reaching down to pick up some clothes or anything like that?
A. I try to avoid that. I try to squat and use my legs more. It's hard to do in the beginning because, you know  but you learn to do things, you know.
Q. Your natural reaction is to bend 
A.  Yes 
(RE. 37, L 1-27)
Q.  but you can't bend anymore. That's what you're telling me?
A. That's right.
Q. But my question to you, Ms. Ray, is: After March of '83 when you were at home and not doing anything, did some of these unusual things take place that you tried to bend forward and it hurt your back again or you picked up some clothes at home and hurt your back again?
A. Yes, it has. Yes.
Q. Did it happen in 1983 after you had left the Health Department?
*768 A. Well, that's kind of hard to answer. I mean, just a instant reflex you will do things, you know, just an instant reflex; and then you realize it's too late, you know, after you done bent a little too far, or picked up something that's a little too heavy.
Q. But that's my question. Did that actually happen after March 1983 that for some unknown reason, like getting out of the bed or reaching for clothes, that you actually made that movement and it hit your back?
A. I don't recall any incident like that.
Q. Okay. But you continued to take medication and you continued to see Dr. Simpson, you see, in 1983 and '84?
A. Yes.
(RE. 38, L 1-25)

HEARING DATE OF 1/6/87
Q. Mr. Upchurch asked you if you were providing primary care for Mr. McCown. I want to ask you if during that time was your son also staying with you in your home?
A. Yes, he was. He was living with me.
Q. What did your son do, if anything, with regard to helping to take care of Mr. McCown?
A. My son worked on the third shift at Biltrite, and, of course, he was there all day. He would get him up and let him sit up for a while or take him to the bathroom, you know. A lot of times he would bring him in  I always tried to let Mr. Trammel eat at least one meal at the table, you know. So Mr. Trammel usually at the table, you know, breakfast in the mornings. Of course, my son got home around seven o'clock, and he would get him up and take him to the table, and, you know, he would take him to the bathroom and put him back to bed and things like that.
(RE. 40, L 2-18)
Q. Now did Mr. McCown have a Home Health Care aide come into your home during the time that he lived with you?
A. Yes, he did, from the time he came there until his last visit to the hospital.
Q. Who were the names of the persons who acted in that capacity?
A. Brenda Wilkerson, she was the first one. And then she changed jobs or something, but anyway Sandra Love, a little back girl, she came the rest of the time.
Q. How often or how many times a week would they come?
A. Three times a week.
Q. Was there ever any time when he stayed with you that they came less frequently?
A. Not unless it happened to be a holiday or something. They would be off then. Now Brenda came even when there was a holiday because she was on contract. She was a contracted aide. She got so much per visit, but Sandy was salaried.
Q. What would they do for Mr. McCown? BY MR. UPCHURCH: Your Honor, we object. This is repetition. It is not rebuttal; it is direct testimony. He chose to open, and it is not rebuttal. He has already addressed these issues in direct testimony. We took the position of rebutting those with Dr. South. His testimony is already in this. This is just trying to show up his own case. This is
(RE. 41, L 1-29)
repetitive. Besides the names of the people, this is precisely what she testified to on direct examination.
BY MR. WALKER: Can I address that, your Honor.
BY ADMINISTRATIVE JUDGE WINSTON: Yes, sir.
BY MR. WALKER: Dr. South implied that he was getting all this great care and that it was coming from Mrs. Ray. I think that has to be touched upon.
BY ADMINISTRATIVE JUDGE WINSTON: I'm aware of that, and I'm aware too that Dr. South said that there were no such things as Home Health aides, and yet I know specifically that there has been one. Now I certainly don't think that Dr. South *769 came here and intentionally told falsehood. I think that she just was not aware of a program that exist, and the testimony of the claimant in my opinion is not rebutted in that particular because I'm of the opinion that Dr. South simply did not know about a program.
BY MR. WALKER: (Continuing)
Q. During the time that Mr. McCown lived with you, did he have to be turned every two hours in his bed?
A. No, Mr. Trammel could turn himself and did.
Q. How did he do that? With the use of his legs or arms, or how did he do it?
A. He would catch the rails. He had a hospital
(RE. 42, L 1-29)
bed, and he would catch the rails and pull himself over.
Q. Did he spend every minute of the day in bed?
A. No, he did not. Up until he was in the hospital when he went in July of 1986, up until then he got up and sat up in a wheelchair, and most of the time he could sit up a couple of hours or three hours. It was just according to how he felt, you know. He has sat up for at least a half a day in a wheelchair, and would eat meals at the table.
Q. Was he able to feed himself?
A. Yes, he was.
Q. Did you ever have to feed him yourself?
A. I fed him some when he was in the hospital. Well, when he would go in the hospital, they would start feeding him. I fed him some during the time that he was in the hospital, but I would get him back to feeding himself when he got home.
(RE. 43, L 1-17)
After the case was re-opened, a hearing was held before the Administrative Judge on February 15, 1989. No question was asked about her physical condition; the proof related to inheritance and medical bills only.
McRAE, Justice, concurring:
I agree with the majority opinion. I write only to point out that the employer engaged in several acts which constitute admissions against interests. The employer denied re-employment to the claimant, said she was unable to perform the nursing duties required of her, and refused to hire her after she had received medical treatment. Further, the employer made an admission against interest by sending one of its other nursing care employees to assist the claimant in caring for Mr. McCown because claimant was unable to perform certain duties because of her injuries.
MRE Rule 801(a) and 801(d)(2) state that nonverbal conduct can qualify as admissions. In addition to the holdings of the majority opinion, I would find that the employer's conduct falls under Rule 801(d)(2) as an admission by a party-opponent and hold that the claim is compensable.
HAWKINS, P.J., joins this opinion.