737 So.2d 416 (1998)
ALUMAX EXTRUSIONS, INC., Self-Insured, Appellant,
v.
Larry WRIGHT, Appellee.
No. 97-CC-00925 COA.
Court of Appeals of Mississippi.
December 30, 1998.
Rehearing Denied March 23, 1999.
Certiorari Denied June 17, 1999.
*417 Joseph T. Wilkins, III, Jackson, Attorney for Appellant.
David L. Walker, Batesville, John D. Watson, Attorneys for Appellee.
Before BRIDGES, C.J., and HINKEBEIN and KING, JJ.
HINKEBEIN, J., for the Court:
¶ 1. This appeal involves a claim for workers' compensation benefits as a result of an accident suffered during the scope of his employment by the respondent/cross-petitioner, Larry Wright, on New Year's Day 1993. Wright filed his petition to controvert on November 14, 1994 against Alumax Extrusions, Inc., a self-insured Mississippi corporation. The administrative law judge [ALJ] awarded Wright temporary total disability benefits minus any amount already paid and any period during which he actually worked for his former employer. In addition, the ALJ awarded Wright permanent partial disability *418 benefits for a 50% industrial disability to his right upper extremity. The Mississippi Workers' Compensation Commission subsequently adopted this order without comment and the circuit court thereafter affirmed the Commission. Alumax now appeals the circuit court's judgment on the following grounds:
I. WHETHER THE MWCC ERRED IN AWARDING TEMPORARY TOTAL DISABILITY BENEFITS FROM JANUARY 2, 1993 THROUGH SEPTEMBER 16, 1994.
II. WHETHER THE MWCC ERRED IN FINDING THAT WRIGHT HAD SUSTAINED A 50% PERMANENT PARTIAL INDUSTRIAL IMPAIRMENT TO THE ARM.
Likewise, Wright cross-appeals, raising the following assignment of error:
II. WHETHER THE MWCC ERRED IN RELATING THE RELEVANT INJURY TO WRIGHT'S ARM, A SCHEDULED MEMBER, RATHER THAN THE BODY AS A WHOLE. Holding that there was substantial credible evidence supporting the findings made by the Commission, we affirm.

FACTS
¶ 2. The record shows that at the time of the hearing Wright was a 27-year-old male without a high school diploma or its equivalent and having experience exclusively in manual labor-type work. Throughout his adult life he has worked at various jobs, each requiring some degree of heavy lifting and many involving such in connection with overhead reaching. For example, Wright has tried his hand as a stock handler in a retail computer store, loaded furniture onto trucks, installed assorted large appliances such as air conditioners, stacked lumber, and installed gas tanks which entailed the operation of a jackhammer.
¶ 3. Wright initially began working at Alumax in Hernando during May of 1990 on a part-time basis in the clean up department. This position, much like his previous jobs, required that he lift 50 or more pounds on a regular basis. Later, as a full-time employee, he first assisted others in cutting aluminum and subsequently was promoted to full-fledged saw operator. Both of these positions again involved, at least on an occasional basis, the stacking of billets, each of which weighed in excess of 200 pounds. On the evening of his accident, however, Wright was not acting in his regular capacity as he was temporarily working as a "charge man", a job which involved the use of a pole to stack material overhead. While engaged in this work, Wright fell from a ten foot platform and landed squarely on his right shoulder, injuring the coinciding rotator cuff and sternoclavicular joint of collarbone.
¶ 4. After visiting a nearby emergency room on the night of the incident, Wright sought follow up treatment from four separate physicians, the last of which was orthopedist Dr. Ernest Lowe of Oxford. Beginning in June, Dr. Lowe treated Wright with little success as Wright continued working, albeit on lighter duty consisting generally of clean up tasks with curtailed hours due to his lingering pain. Finally, in September, Dr. Lowe performed arthroscopic surgery on the affected shoulder. Although Wright subsequently made significant progress and returned to work in early November, again with restrictions against working overhead and participating in any lifting over twenty-five pounds, he continued to experience pain associated with the collarbone injury. In response to Wright's complaints, Dr. Lowe performed a second surgery in March of 1994 in an attempt to alleviate this discomfort. On March 24 Wright was released to return to work again on temporary light duty; however, no work was available within his restrictions. Then on April 28, he was released to return so long as he, once again, avoided lifting above the shoulder or more than twenty-five pounds in any fashion. However, due to continuing discomfort, Wright did not work during the entire *419 month of June so that he could undergo physical therapy. With this phase of treatment ending, he once more reported back for regular duty at Alumax on July 11, 1994.
¶ 5. During the weeks that followed Wright was placed on probation once for refusing to perform tasks arguably outside his physical limitations and twice more for refusing to sign certain related paperwork without the advice of counsel. Wright nevertheless returned to Alumax each time, generally completing his assigned duties at his pre-injury rate of pay, but never able to resume his previous responsibilities as either a saw operator or helper.
¶ 6. Then on August 2, 1994, Wright was involved in an automobile accident. Although he was uninjured, his car sustained extensive damage and, as a result, he was left without transportation to and from work. Following company policy, Wright immediately notified Alumax of his predicament. However, during the next three weeks he failed to either report for his shift or contact his supervisory personnel again regarding the problem. Therefore, on August 22, 1994 his employment at Alumax was terminated. Later, in September, Dr. Lowe recommended to Wright that he permanently refrain from work requiring heavy lifting or use of his right arm above shoulder level. Since that time Wright has been searching, unsuccessfully, for comparable work elsewhere.
¶ 7. Based upon these facts as described by Wright himself during the March 1996 hearing on his claim and confirmed by Dr. Lowe's deposition, the ALJ awarded Wright temporary total disability benefits in the amount of $235.84 per week for the period of January 2, 1993 through September 16, 1994 minus any amount already paid and any period during which Wright actually worked for his former employer. In addition, the ALJ awarded Wright permanent partial disability benefits for 100 weeks due to a 50% industrial disability to his right upper extremity despite Dr. Lowe's assignment of only a 13% impairment to the member based upon AMA guidelines. It is the Commission's subsequent order affirming these conclusions which we now examine.

ANALYSIS
¶ 8. From the outset we must emphasize the well-settled rule that the Mississippi Workers' Compensation Commission is the ultimate finder of fact, and its findings are subject to normal deferential standards of review. Natchez Equip. Co., Inc. v. Gibbs, 623 So.2d 270, 273 (Miss. 1993). In Walker Mfg. Co. v. Cantrell, 577 So.2d 1243, 1247 (Miss.1991), the Mississippi Supreme Court stated:
We have repeatedly read this statute to establish the Circuit Court's function as that of an intermediate court of appeals. More to the point, we have held repeatedly that the Circuit Courts must defer in their review to the findings of the Commission.
In a very real sense, all of this is nothing other than a workers' compensation variant on accepted limitations upon the scope of judicial review of administrative agency decisions, i.e., that the courts may interfere only where the agency action is seen as arbitrary or capricious. Arbitrariness and caprice are in substantial part a function of the presence vel non of credible evidence supporting the agency decision. Where we find such evidence, we have no more authority to interfere with the decisions of the Commission than we do in a case of any other administrative body.
(citations omitted). In keeping with this standard, the findings of the Commission will only be reversed on appeal where such findings are clearly erroneous and contrary to the overwhelming weight of the evidence. Ray v. Mississippi State Bd. of Health, 598 So.2d 760, 764 (Miss.1992). "If the findings are supported by substantial evidence, then they are beyond the power of this Court to disturb." Id. With *420 this in mind, we begin our examination of the parties' arguments.
I. WHETHER THE MWCC ERRED IN AWARDING TEMPORARY TOTAL DISABILITY BENEFITS FROM JANUARY 2, 1993 THROUGH SEPTEMBER 16, 1994.
¶ 9. During his deposition Dr. Lowe made three separate, somewhat confusing statements with regard to the date upon which Wright reached maximum medical improvement [MMI]. Dr. Lowe stated during the exchange that: (1) Wright's temporary total disability ended on April 28, 1994, (2) Wright was released to return to regular duty at work on July 11, 1994, and (3) Wright reached MMI six months following his second surgery on September 16, 1994. As mentioned above, the Commission chose to use the last of these dates as a basis for determining the duration of his temporary disability and the associated benefits. Alumax now claims that this decision was incorrect. We, however, disagree as we believe that there is substantial supporting evidence in the record.
¶ 10. Temporary total disability extends until maximum medical recovery is reached. Mississippi Code Annotated 71-3-17(b) (Rev.1995). Expressed differently, the term refers to the healing period following injury. It begins with the disabling injury and continues until such time as the employee is cured or is as far restored as the permanent character of his injuries will permit. VARDAMAN DUNN, MISSISSIPPI WORKMEN'S COMPENSATION § 75 (1990). The issue involves both medical (whether further strengthening may be anticipated) and non-medical (facts touching on claimant's employment situation) components. McGowan v. Orleans Furniture, Inc., 586 So.2d 163, 168 (Miss.1991) (quoting 4 LARSON, WORKERS' COMPENSATION LAW § 57.12(c) (1998)). Thus, with regard to the medical aspect of the issue, the persistence of pain or the fact that some continuing treatment is necessary does not rule out a finding that the condition has become stabilized if no further improvement is expected. McGowan, 586 So.2d at 168. By the same token, if there is some hope of recovery, the later realization that no improvement resulted does not bar a finding that the healing period persisted throughout the process of treatment. Id. The same degree of uncertainty exists on the non-medical front, as the date upon which a claimant is released to work is not necessarily the date on which that employee's temporary disability has ended. DUNN, MISSISSIPPI WORKMEN'S COMPENSATION LAW § 75. It therefore is primarily the duty of the Commission to sort through the testimony of both medical and lay witnesses in answering the maximum medical recovery question. McGowan, 586 So.2d at 168.
¶ 11. Holding the testimony of both Wright and Dr. Lowe against the standard described above, we must resolve the apparent conflicts in the physician's testimony in Wright's favor. Based upon the totality of the evidence, it is apparent that until September 1994 Dr. Lowe constantly continued to reassess and was hopeful of improving Wright's condition. We, much like the ALJ and the Commission, consider this to be suggestive of a September date of maximum medical recovery. Therefore, with the Commission's decision removed from the realm of the arbitrary, we hold this assignment of error to be without merit and affirm the award of temporary total disability benefits.
II. WHETHER THE MWCC ERRED IN RELATING THE RELEVANT INJURY TO WRIGHT'S ARM, A SCHEDULED MEMBER, RATHER THAN THE BODY AS A WHOLE.
III. WHETHER THE MWCC ERRED IN FINDING THAT WRIGHT HAD SUSTAINED A 50% PERMANENT PARTIAL INDUSTRIAL IMPAIRMENT TO THE ARM.
¶ 12. We address Wright's cross-appeal together with the second issue presented by Alumax as the two are, to some extent, intertwined. In entertaining *421 Wright's assertion that the Commission erred in relating the relevant injury only to his arm due to the involvement of the rotator cuff and sternoclavicular joint, we need only look to Walters Bros. v. Loomis, 187 So.2d 586 (Miss.1966) and its subsequent application in Richey v. City of Tupelo, 361 So.2d 995 (Miss.1978).
¶ 13. In Loomis, a painter fell from a ladder sustaining injuries to his shoulder. Medical testimony indicated that upon reaching maximum medical recovery, he had a permanent disability from 25 to 30 percent in the right upper extremity. In addressing Loomis' claim that his disability should have been related to the body as a whole, the Mississippi Supreme Court wrote:
[T]he result of the injury, shown by the facts in the particular case under review, must be looked to, and that the point of impact upon the body, or the location of the traumatic injury should not necessarily be controlling. In other words, the result of the blow to the shoulder might result only in the loss of the use of an arm, a scheduled member, as in this case; or it may result in a back or neck injury, in which case, the compensation would be payable upon the basis of the result.
Loomis, 187 So.2d at 589. In other words, it is the effect upon one's occupational capabilities which is determinative. In both Loomis and Richey, another case involving a shoulder injury, the court applied this test to the medical evidence presented and held that only the associated scheduled member demonstrated functional loss of use. Loomis, 187 So.2d at 590; Richey, 361 So.2d at 997. Consequently, in both instances the court affirmed the Commission's decision relating the injuries only to the loss of use of the arm. Id. Much the same, in this instance the record makes clear that Wright's injury resulted only in some diminished use of his arm. Since we too recognize that the interpretation of evidence and the resolution of ambiguities and apparent conflicts are matters peculiarly within the province of the Commission as the trier of facts, we also affirm on this issue. This having been settled, we proceed to the appropriate award of benefits, specifically addressing the question of whether the evidence indicates sufficient loss of wage earning capacity to support a finding of industrial disability beyond the medical impairment assigned Wright's arm.
¶ 14. Where an injury to a scheduled member has rendered an employee permanently partially disabled, the Act arbitrarily schedules the compensation payable with reference to the claimant's functional loss, with the award being for "proportionate loss or loss of use of a member." Mississippi Code Annotated § 71-3-17(c)(23) (Rev.1995). The derivative mathematical formula for proportionate compensation has been interpreted by our supreme court as follows: "66 2/3 of the average weekly wage, subject to the maximum rate, for a number of weeks equal to the percentage of loss multiplied by scheduled number of weeks allowable for total loss of a member." Smith v. Jackson Const. Co., 607 So.2d 1119, 1125-28 (Miss.1992). Because Wright's injury was limited solely to his arm, his rights must be determined within these parameters.
¶ 15. From the outset we must observe the distinction between the medical or functional impairment of a scheduled member, and an occupational impairment to the same. Our supreme court has recognized that the former represents actual physical infirmity while the latter is a function of such, affecting the claimant's ability to perform the duties of employment. Robinson v. Packard Electric Div., General Motors Corp., 523 So.2d 329, 330-31 (Miss.1988). Therefore a claimant having only a partial impairment to a scheduled member may, through other considerations, establish that, for purposes of his wage earning capacity, the impairment has rendered him or her totally occupationally disabled. In such event, the claimant is *422 entitled to compensation for complete disability under § 71-3-17(a). Smith v. Jackson Const. Co., 607 So.2d 1119, 1125-28 (Miss.1992). Similarly, a claimant seeking compensation for an occupational disability to a scheduled member which exceeds the assigned partial functional impairment and yet falls short of 100% must establish under § 71-3-17(c) that the partial impairment has adversely impacted his or her wage earning capacity to an extent greater than the medical percentage of impairment. Smith, 607 So.2d at 1125. The question is whether or not the record reveals substantial evidence of such in this case.
¶ 16. Factors to be considered in determining loss of wage earning capacity include the amount of education and training that the claimant has had, his inability to work, his failure to be hired elsewhere, the continuance of pain, and any other related circumstances. McGowan v. Orleans Furniture, Inc., 586 So.2d 163, 167 (Miss.1991). The proof presented before the ALJ and expressly noted in the resulting decision reveals volumes as to these details. For example, the testimony disclosed Wright's failure to complete high school and subsequent employment exclusively in positions requiring some degree of strenuous lifting and/or overhead reaching. Dr. Lowe also painted a clear picture of Wright's continuing pain which resulted in his inability to perform the substantial acts required by his most recent job as saw operator. Moreover, both the medical and lay testimony (both that of Wright and Alumax personnel) revealed Wright's earnest efforts at various forms of physical therapy as well as repeated and seemingly sincere efforts to return to work. And even following his termination from Alumax, Wright made exhaustive and well documented attempts at securing alternative employment. While these facts certainly lend support to the findings below, Alumax nevertheless urges that we consider Wright's termination to be determinative as per se evidence of unchanged wage-earning capacity. Failing that argument, Alumax directs our attention to (1) Wright's termination, (2) his ability to return to work at his pre-injury rate of pay, and (3) his subsequent disclosure of his physical limitations to potential employers, contending that the combination of these events must surely operate to tip the scales against a finding of diminished wage earning capacity. We disagree with both propositions.
¶ 17. Regarding Wright's unchanged rate of pay, the applicable statutory test is calculated by comparing actual earnings before the injury with earning capacity after the injury. Russell v. Southeastern Utilities Service Co., 230 Miss. 272, 282, 92 So.2d 544, 547 (1957). That Wright earned $9.20 per hour at Alumax before (and after) his injury is undisputed. Earning capacity is a more theoretical concept, however, requiring an estimation of future impairment of earnings based upon both actual post-injury earnings and other probative evidence. Russell, 230 Miss. at 282, 92 So.2d at 547. Therefore, despite the well-established presumption in Mississippi that the actual post-injury earnings serve to create both a rebuttable presumption of earning capacity commensurate therewith and as strong evidence against a claim of disability in excess thereof, a finding of disability may yet stand even when the earnings remain equal or increase. Id.; Georgia-Pacific Corporation v. Gregory, 589 So.2d 1250, 1256 (Miss.1991). Factors which may accomplish this via demonstrating incapacity or the temporary and unpredictable nature of the earnings include the payment of wages disproportionate to capability out of sympathy. Russell, 230 Miss. at 282, 92 So.2d at 546. In this instance, because the record strongly suggests that this, or perhaps appreciation for Wright's previous years of hard work, were at play, we are unprepared to reject the Commission's finding that he effectively overcame the presumption.
*423 ¶ 18. We conclude similarly as to Wright's efforts to find alternative employment. To establish disability, the injured employee bears the burden of showing that he has sought and been unable to obtain work "in similar or other jobs." Georgia Pacific v. Taplin, 586 So.2d 823, 828 (Miss.1991). Wright has certainly fulfilled this obligation since, by his own testimony, he listed the numerous local businesses he contacted regarding possible work. The volumes of supporting evidence indicate that although he had the necessary skills and background, many of the potential employers contacted were simply not hiring and those that were had legitimate concerns about his physical condition.
¶ 19. Once the claimant has made a prima facie case, the burden shifts to the employer to show that his efforts were not reasonable or constituted a mere sham. Id.; Pontotoc Wire Products Co. v. Ferguson, 384 So.2d 601, 603 (Miss.1980). With this in mind, it is Wright's occasional disclosure that he continued functioning both under a doctor's care and with some impairment to his arm due to his surgeries which Alumax characterizes as "manipulation of the job search to materially benefit his claim." In essence, the company's argument is that he had no actual intent to work but merely acted to conform to the requirements of settled workers' compensation law. This contention might have some basis if Wright's admissions had contained exaggerations or misinformation regarding his situation and abilities; however, there simply is no evidence of such is the case. Wright cannot be faulted for responding truthfully when asked specific and direct questions about his diminished strength. The Commission found Wright's efforts to have been reasonable and the evidence supports that view.
¶ 20. As for Wright's termination, Alumax is correct that an employee may not resume regular employment, subsequently get fired for reasons unrelated to the impairment, and thereafter expect a finding of compensable disability. See Sibley v. Unifirst Bank for Savings Through Resolution Trust Corp., 699 So.2d 1214 (¶ 29) (Miss.1997) (examining employee's unaffected job performance peppered with promotions and raises up until her subsequent discharge for criminal activity). On the other hand, where there is evidence that the claimant has genuinely been hampered by his impairment in obtaining or holding other employment, the appropriate resolution is not quite so apparent. 4 LARSON, WORKERS' COMPENSATION LAW § 57.64(a) (1998). The resolution, therefore, of any given case is driven by our supreme court's oft-repeated declaration that a determination regarding diminished wage-earning capacity must be made from the evidence as a whole. Piggly Wiggly v. Houston, 464 So.2d 510, 512 (Miss.1985). With this in mind, we refrain from holding any isolated fact, including justifiable termination, to be dispositive.
¶ 21. As for the claim propounded by Alumax that the union of these occurrences should require reversal, we once again must stress that we will not determine where the preponderance lies when the evidence is conflicting. Metal Trims Industries, Inc. v. Stovall, 562 So.2d 1293, 1296-7 (Miss.1990). So long as the record contains credible evidence which, if believed, would support the Commission's determination, we must affirm. Walker Manufacturing Co. v. Cantrell, 577 So.2d 1243, 1247 (Miss.1991) (stressing that it should be of "no moment" that we may have found otherwise had we sat triers of fact). Cantrell, 577 So.2d at 1247. Because such is the case here, we hold this assignment of error to be without merit as well.
¶ 22. THE JUDGMENT OF THE CIRCUIT COURT OF DESOTO COUNTY AFFIRMING THE ORDER OF THE MISSISSIPPI WORKERS' COMPENSATION COMMISSION IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
*424 BRIDGES, C.J., McMILLIN and THOMAS, P.JJ., and COLEMAN, DIAZ, HERRING, KING, PAYNE and SOUTHWICK, JJ., concur.