JACKSON *v.* BAILEY, et al.

No. 40958 December 15, 1958 107 So. 2d 593

*James Stone & Sons, T. H. Freeland, III,* Oxford; *Kenneth Rayner,* Memphis, Tennessee, for appellant.

*McClure, Fant & McClure,* Sardis, for appellees.

HALL, J.

This is a workmen's compensation case. The appellant claims benefits as the widow of Robert Jackson, deceased. There are two issues for decision by us. One is whether or not the death of Robert Jackson is compensable, and the other is whether the appellant is entitled to compensation, if any is due, as the widow. The attorney-referee found that the death of the deceased did not arise out of and in the course of his employment and he did not make any finding as to whether or not the appellant was the widow of deceased within the purview of the Workmen's Compensation Law. The Workmen's Compensation Commission held that the claim was compensable but that the appellant was not the widow of deceased within the purview of the Act. On appeal to the circuit court it reinstated the opinion of the attorney-referee, finally disallowing, denying and dismissing the claim, from which this appeal is prosecuted by the claimant.

There is no dispute as to the facts in this case and the question for decision is purely one of law. Hence this is not a case where there is substantial evidence to support the order of the Commission.

Robert Jackson resided in DeSoto County, Mississippi. He was employed by Robert K. Bailey, Jr., to do manual labor in doing some revetment work along the Mississippi River in connection with a contract which Bailey had with the Government. Forty percent of this work was done in Mississippi, forty percent in Arkansas and twenty percent in Tennessee. Mr. Bailey was a citizen of DeSoto County, Mississippi, and the Mississippi law unquestionably applied to this employment.

■■ ■ On August 10, 1956, Robert Jackson left his home in DeSoto County and rode with another employee to the point in Tennessee, just a short distance north of the state line between Tennessee and Mississippi, where the entire crew was put to work. They continued at that point for about one and one-half hours and then they were moved down the river, nearer to the Mississippi line, where they resumed their labor and so continued until shortly after noon. Then they were told to move to a third point down the river, still nearer to the Mississippi line. They proceeded en route to the third point where they were directed to work, but there was no public road available but only a farm road. They finally came to a place where the road was blocked with limbs and they had to stop. They were riding in an open metal body truck, without any covering over the same, on which there was loaded an air compressor which weighed about 1800 pounds. Mr. Bailey and Mr. Fasackerly were following them. Fasackerly was superintendent of the job and directed the employees to wait at the point where they were stopped while he and Mr. Bailey looked for some other route which could be followed to the place where they were to work. By this time it was drizzling rain and the clouds were overhanging and the wind blowing from the southwest and there were flashes of lightning in the air.

While they were waiting at this point for the return of Mr. Fasackerly and Mr. Bailey, they alighted from

the truck in which they were riding and three of the men, including the deceased, were standing within three feet of the truck, on wet ground and in wet clothes, when a bolt of lightning unexpectedly struck the three, inflicting death upon Robert Jackson and seriously injuring the other two. This occurred in a practically level place and where there was no shelter to which the men could seek refuge,—in fact where they were placed by the superintendent. It was in an open place and there were no trees in less than about 300 feet.

Bearing in mind that the Compensation Act must be liberally construed, we are of the opinion that the death of Robert Jackson arose out of and in the course of his employment at a time when he was where the master had placed him.

In the case of Pigford Bros. Construction Co. v. Evans, 225 Miss. 411, 83 So. 2d 622, we were dealing with a man whose death occurred during the tornado which struck the City of Vicksburg in 1953. That man was required to work on a dragline near the Mississippi River. One of his duties was that in case of rain he should use a tarpaulin to cover the brake drums on the dragline and to keep it in place. While he was thus engaged the tornado struck and picked up a boat rudder from some point down the river and cast it against his body on top of the dragline with such force as to sever his head and cause his immediate death. In this case we said: "Clearly Evans' death occurred while he was in the course of his employment, performing the necessary and usual duties of his job. We think also that his injury arose out of his employment. All of the courts agree that injury due to windstorm, as well as to lightning, earthquake, freezing, sunstroke and exposure to contagious diseases, arises out of the employment if the employment increases the risk of this kind of harm. 1 Larson, Workmen's Compensation Law (1952) Sec. 8.20. In other words, if an employee, by reason of his duties, is exposed to a special

or peculiar danger from the elements, which increases the risk of injury and is within the sphere of the employment, such injury arises out of the employment. 58 Am. Jur., Workmen's Compensation, Sec. 260; 6 Schneider, Workmen's Compensation Text (1948) Sec. 1552, pp. 78-89; Malone, Louisiana Workmen's Compensation Law and Practice (1951) Sec. 193; Horovitz, Workmen's Compensation Law (1944) pp. 99-107; Annotations in 13 A. L. R. 974, 25 A. L. R. 146, 40 A. L. R. 400, 46 A. L. R. 1218, 83 A. L. R. 234. * *

"Clearly Evans' employment increased the risk of this kind of harm to him. Accordingly, under the universal rule his job was a contributing factor to his injury and death. They were connected in fact with his employment. Hence death arose out of his employment. The test is connection in fact with the employment, not whether it is foreseeable in advance, or apparently only in retrospect.

"Since this accident manifestly comes within the universally recognized increased risk test, we do not need to consider at this time the other criteria which have been used by the courts in deciding compensation cases involving 'acts of God' and exposure to the elements, such as the actual risk doctrine, the positional risk test, and the contact-with-the-premises-exception, which are discussed so lucidly in Mr. Larson's textbook, supra, Sections 6 through 8.

"Appellants claim that the position of the employee was no different from that of the general public and was common to the neighborhood, so no causal relationship exists. However, Evans' job placed him in a position of increased risk. Moreover, whether the risk is common to others in the vicinity is of little if any value in determining whether in fact the injury is connected with the employment."

In Vol. 1 of Larson's Workmen's Compensation Law, Sec. 8.42, there is a discussion of the question as to when

an injury occurs in the course of employment and the writer says on page 65: "Since most of these cases arise during extremely hot, cold, rainy or stormy weather, the most direct way to approach a working rule is to ask: what does the average man, free of the obligations of any particular employment, do when it is twenty below, or a hundred in the shade, or raining, sleeting or snowing violently? There may be various answers to what he does, but there is one clear answer to what he does not do. He does not stay outdoors all day. Yet a surprisingly number of cases narrow the class of the 'general public' to people who do just that."

In the same section of the same work, Mr. Larson discusses several cases and says: "But the whole point is that these workers are outside because it is the nature of their employment to require them to be outside. Unless so required, any sane and adult member of the general public is supposed 'to have sense enough to come in out of the rain.' "

It will be remembered that the facts show without dispute that Robert Jackson was ordered to remain at the point where he was killed, and the record shows that he could not leave that point without incurring the risk of being fired, and consequently he was not able to seek shelter from the rain and lightning. In this connection, in the same section of Mr. Larson, on page 68, he says: "The other principal respect in which the increased-risk has sometimes not been fairly applied is the failure to recognize that the obligations of the employment will often not permit the employee to obtain shelter or relief from the elements, even when such relief is theoretically available to him. * * * Realistically, the fallacy in all this is simply that the exigencies of employment, whether of a common laborer or a busy supervisor, do not permit the employee to drop everything and minister to his personal comfort whenever it might seem advisable. It would surely be wrong to say that no road-worker should

ever recover for sunstroke as long as there is a shade tree in sight.

"The better view is thus expressed by Heher, J.: (Mixon v. Kalman, 42 App. 2d 309, 133 N. J. L. 113)

" 'It is common experience that those outdoors generally seek shelter, against both rain and lightning, as a thunderstorm approaches; but here the deceased servant's freedom of action for self-preservation was circumscribed by the conditions of his employment. . . And the same principle is applicable to the frostbite and sunstroke cases.' (The court itself cites, as authority for the last sentence, Ciocca v. National Sugar Refining Co., 124 N. J. L. 329, 12 A. 2d 130.)"

There are numerous cases in support of our position but we think the case of State of Minn. ex rel People's Coal & Ice Co. v. District Court of Ramsey County, 123 Minn. 502, 153 N. W. 119, L. R. A. 1916A 344, is in point, and we quote briefly from the opinion therein: "The deceased was employed by relator as a driver on one of its ice routes. He drove an open wagon and his duties required him to work in all kinds of weather. It was permissible to seek shelter from storms in such way as one might; but the necessity of prompt daily deliveries required the drivers to complete their routes in substantial disregard of weather conditions.

"On the morning of September 1, 1914, during a severe rain storm, accompanied by lightning, the deceased was on his usual route. He left his team in the street and went towards a large elm tree standing just within the lot lime, either for protection from the storm, or his way to solicit orders. There was an iron fence along the lot. Just as he reached the iron fence lightning struck the tree and struck him, and he was killed, his body falling upon the fence. It may be mentioned, though little importance is attached to it, that he carried a steel pick in a holster on his left hip in accordance with the usual

custom. He had been working all morning in the storm, using an uncovered wagon, and subject to the elements.

"The workmen's compensation act, so far as here material, requires compensation to be paid by the employer 'in every case of personal injury or death of his employee, caused by accident, arising out of and in the course of employment, . . .' Laws 1913, p. 677, chap. 467, sec. 9 (Gen. Stat. 1913, sec. 8203). * * *

"We are of the opinion that the evidence is sufficient to sustain a finding that the accident to the decedent resulting in his death was one 'arising out of' his employment."

We think it is clear that this death arose out of and in the course of Robert Jackson's employment, and that the holdings to the contrary of the lower tribunals are in error.

The next question is whether or not the appellant is entitled to compensation as the widow of deceased. In the compensation law of Mississippi the term 'widow' is defined in paragraph (14) of Section 6998-02 of the Miss. Code of 1942 Rec.:

"The term 'widow' includes the decedent's legal wife, living with him or dependent for support upon him at the time of his death, or living apart for justifiable cause, or by reason of his desertion at such time, provided, however, such separation had not existed for more than 3 years without an award for separate maintenance or alimony or the filing of a suit for separate maintenance or alimony in the proper court in this state. *The term 'widow' shall likewise include one not a legal wife, but who had entered into a ceremonial marriage with the decedent at least one year prior to his death, and who on the date of the decedent's death stood in the relationship of a wife, provided there was no living legal spouse who had protected her rights for support by affirmative action as hereinabove required.* The term 'widow' or 'widower' as contemplated in this act shall not apply to any

person who has since his or her separation from decedent entered into a ceremonial marriage or lived in open adultery with another.'' (Emphasis supplied)

 The facts show without dispute that the claimant in this case was originally married to a man named Teague about the year 1937 and that about 1938 Teague deserted her and went off with another woman to Waterloo, Iowa, where they were living together the last time that claimant heard from him. She was married to the deceased in a ceremonial marriage in December 1942, after which time she and Robert Jackson continuously lived together and she was supported wholly by him until the date of his death. She admitted that she did not obtain a divorce from Teague, but she does not know whether he ever obtained a divorce. During the time that claimant lived with Robert Jackson they called themselves husband and wife and were known generally throughout the community where they resided as being husband and wife. In fact Jackson at one time was employed in Memphis, Tennessee, and filled out a social security blank in which he named the claimant as beneficiary as his wife. He also took out an insurance policy in which she was named as his wife as beneficiary. There was no effort whatsoever made by the employer or carrier to show where Teague had been living, whether he was still living, and whether he had ever obtained a divorce. We think this burden was on the employer and the carrier. There is a strong presumption of the validity of the marriage between the claimant and the deceased, and the burden of overcoming this presumption is on the party who questions it. In the case of Pigford Bros. Construction Co. v. Evans, supra, on page 421 of 225 Miss., we cited with approval the case of Anderson-Tully Co. v. Wilson, and said:

''In Anderson-Tully Co. v. Wilson, 221 Miss. 656, 76 So. 2d 735 (1954), this Court in a workmen's compensation case followed a long line of decisions on related is-

sues and held that a strong presumption of validity operates in favor of a second marriage, and that the party attacking the validity of such marriage has the burden of proving its invalidity, even though it involves the proving of a negative. Even where a valid prior marriage is shown, it may be presumed in favor of the second marriage that the first marriage has been dissolved, either by divorce or death of the former spouse, 'so as to cast the burden of adducing evidence to the contrary on the party attacking the second marriage, even though he is thereby required to prove a negative.'

"In this case the only evidence offered by appellants to rebut this strong presumption of validity of a second marriage was the testimony of Evans' first wife, Lula Mae. She said she had not divorced Evans, and he had not divorced her. She claimed no compensation. This evidence was not sufficient to rebut the presumption of validity of Evans' marriage to Willie Alice. As stated in numerous cases and in Amis, Divorce and Separation in Mississippi (1935) Sec. 54, such an admission does not adequately prove whether a divorce has been granted to the other party, Evans. The practical course of proof in such a case would be to show where each party to the prior marriage had resided up to the time of the second marriage, and then to procure from the clerk of the proper court in each such county a certificate of search showing that no divorce or annulment had been granted by the court of which he is clerk. See Pigford v. Ladner, 147 Miss. 822, 112 So. 785 (1927). This required that appellants offer such documentary proof from Quitman, Panola and Forrest Counties. Code of 1942, Secs. 2738, 1852. Appellants failed to meet this burden of proof in this case. This rule places a difficult burden of proof upon those contesting a second marriage, but it is based upon a sound public policy and is well established."

We conclude that under our authorities the claimant is entitled to compensation and the judgment of the lower

court and of the Workmen's Compensation Commission and of the attorney-referee are therefore being reversed and judgment entered here in favor of the claimant and the cause remanded to the Compensation Commission for supervision of the payments due. Counsel for appellant are hereby allowed an attorneys fee of one-third of the total amount of the recovery.

Reversed and judgment here and remanded.

*McGehee, C. J.,* and *Lee, Holmes* and *Ethridge, JJ.,* concur.