# IN THE COURT OF APPEALS
## OF THE
## STATE OF MISSISSIPPI
### NO. 2001-WC-01025-COA

**RAYTHEON AEROSPACE SUPPORT SERVICES AND LIBERTY MUTUAL INSURANCE COMPANY**                                        **APPELLANTS**

**v.**

**ORA MILLER**                                                                                                    **APPELLEE**

| | |
|---|---|
| DATE OF TRIAL COURT JUDGMENT: | 06/01/2001 |
| TRIAL JUDGE: | HON. LEE J. HOWARD |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | GEORGE E. READ |
| | J. KEITH PEARSON |
| ATTORNEYS FOR APPELLEE: | DAVID C. OWEN |
| | JEFFREY CARTER SMITH |
| NATURE OF THE CASE: | CIVIL - WORKERS' COMPENSATION |
| TRIAL COURT DISPOSITION: | AFFIRMED DECISION OF THE ADMINISTRATIVE LAW JUDGE |
| DISPOSITION: | AFFIRMED AND REMANDED - 07/30/2002 |
| MOTION FOR REHEARING FILED: | 8/12/2002; denied 10/8/2002 |
| CERTIORARI FILED: | |
| MANDATE ISSUED: | |

EN BANC.

BRANTLEY, J., FOR THE COURT:

¶1. Miller suffered two work-related injuries at Raytheon Aerospace Support (Raytheon),one of which was admitted and one denied by Raytheon. The administrative law judge awarded Miller permanent total disability benefits for 450 weeks. Raytheon appealed and the Commission affirmed in part and vacated in part. Miller appealed to the Circuit Court of Lowndes County which reversed the Commission and reinstated, in toto, the order of the administrative law judge. Raytheon appeals, arguing that the decision of the circuit court was not supported by substantial evidence. Finding no error, we affirm.

## FACTS[1]

¶2. Miller testified that she completed the eleventh grade. She has spent virtually her entire adult life working in custodial type jobs and as a cook. These were minimum wage jobs. She began working for Raytheon as

a custodian and normally worked the third shift. She capably discharged her duties, which required her to clean various assigned buildings and carry loads of trash weighing up to fifty pounds.

¶3. Miller further testified that she sustained a work-related injury on or about May 8, 1996, while in the course and scope of her employment with Raytheon. Claimant said she tripped over a clothing rack while attempting to get a buffer. She hurt her right hand, left knee and back. She stated a co-worker named Cynthia picked her up, because she could not move. She was taken by her supervisor to the Baptist Memorial Hospital-Golden Triangle in Columbus, Mississippi, where she received treatment. Subsequently, she was seen by Dr. Scott Jones, who referred her to Dr. John Gassaway for an evaluation. She was off work as a result of this injury. When she was released by Dr. Jones to return to restricted duty work, she took her "papers" to Deborah Junkin, who called in Sharon Smith and John Gerhardt. She said Mr. Gerhardt took her crutches and threw them in the garbage. He said they did not have any restricted duty work and she was sent home.

¶4. Miller testified that she also saw Dr. Manuel Carro, who practices at the Semmes-Murphey Clinic in Memphis, Tennessee. He provided a course of treatment and recommended physical therapy exercises for her back. Dr. Carro released her to return to work on or about August 1, 1996. At that time, Miller lived at home with her husband, now deceased; son, Stacy Nowell; and daughter, Tammy Bond. Miller testified that she did not feel like she was capable of performing her job duties, but she needed the money. Accordingly, she was excited to be going back to work.

¶5. Miller, upon returning to work on or about August 5, 1996, was assigned her custodial duties and attempted to perform them. In the early hours of August 6, 1996, she attempted to pull a floor buffer from an overhead locker, when she felt a sharp pain in her back. This pain brought her to her knees, where she remained for approximately an hour. She testified that when she got to her feet she went to the custodial office and remained there until her supervisor, John Gerhardt, arrived at work at approximately 6:00 a.m. She notified Mr. Gerhardt of this injury and then went home. She was treated by Dr. Carro both before and once after the second injury.

¶6. Miller testified that Ruthie Williams, a co-employee and former friend, regularly asked her husband to buy cigarettes for her at the Columbus Air Force Base at a discounted price. However, Miller's husband informed Ruthie Williams that he would no longer buy cigarettes for her and this caused Ms. Williams to become angry. She testified that Ruthie Williams had cheated on her time cards with the employer. She and Ms. Williams were no longer friends at the time of the hearing.

¶7. Miller testified that she received a letter of reprimand from the employer on or about August 6, 1996; a letter informing her that she was not covered under workers' compensation on August 7, 1996; and a letter of suspension on August 8, 1996. She received a telephone call from Jon Horton on or about August 18, 1996 informing her that she had been terminated and needed to return her uniform and keys.

¶8. Miller was a passenger in a motor vehicle accident on or about August 20, 1997. She was wearing a seat belt, but sustained injuries to her chest.

¶9. Miller testified that she attempted to do a job search with the employers listed on the vocational assessment done by Sam Cox, Vocational/Rehabilitation Expert hired by Raytheon. She went to all the prospective employers seeking employment and they told her that they were not hiring. She could not recall the specific date that she went to the employers. She completed some applications, but could not recall the

exact number. Additionally, she contacted the "motels" in Columbus by telephone the week before the hearing.

¶10. Miller's son, Stacy Nowell, testified that he was thirty-three years old at the time of the hearing. Mr. Nowell said he was legally blind and disabled. He had been living with his mother since July 2, 1993. He recalled his mother working from the time he was a "kid" until she was injured at work. Mr. Nowell testified that he learned of his mother's injury via a telephone call to their home. His sister went to the hospital to get her. When his mother returned home, she appeared to be in a great deal of pain and indicated that she was hurting in her back and knee. Mr. Nowell said she "laid on the couch and stayed there." She could not do any chores around the house. Mr. Nowell testified that she got a "little bit better" after her May 1996 injury but she was still not physically able to do housework.

¶11. Mr. Nowell testified that he recalled when his mother was released by Dr. Carro to return to work in August of 1996. He said she seemed to be excited about going back to work; however, he could tell that she still seemed to be in pain in her back and knee. Mr. Nowell said he and his younger sister were living with her when she returned to work on August 5. His sister prepared her lunch because she was unable to do it herself.

¶12. Mr. Nowell said he next saw his mother at approximately 10:00 a.m. the next morning. She was returning from the doctor and appeared to be in a great deal of pain. Her condition had seemingly worsened and her primary complaint was pain in her back and knee. Further, she continues to complain of back and knee pain and is not physically able to do housework.

¶13. Mr. Nowell testified that subsequent to his mother's injury she and Ruthie Williams had an argument over whether or not his mother's husband would continue to buy Ruthie Williams cigarettes at a discounted price through the PX at the Columbus Air Force Base.

¶14. Tammy Bond, Miller's daughter, testified on her behalf. Ms. Bond said she moved back in with her mother after her divorce. She lived there from April 1996 through November 1998. She recalled the day her mother was injured in May of 1996. Ms. Bond said she was called to the hospital because her mother had been injured. When she arrived, her mother was in a wheelchair and appeared to be suffering from pain in her knee and back. Ms. Bond said she took her home, where she and her father helped her in the house. She said her mother was crying and appeared to be in a great deal of pain and made it as far as the sofa.

¶15. Ms. Bond recalled taking her mother to see Dr. Jones who prescribed physical therapy. Her sister took her to see Dr. Carro in Memphis. She did not remember the exact date he released her mother to return to work, but she recalled preparing her meal that evening. She said her mother was not able to prepare her own meal, but was excited about going back to work because she wanted her job. She said her mother appeared to be in pain when she left for work.

¶16. Ms. Bond testified that when she next saw her mother, she was crying and appeared to be in excruciating pain. She complained about her back and leg hurting and went directly to the sofa. Ms. Bond said she waited a short while to see if she was going to feel better. She then took her to see Dr. Stanback.

¶17. Ms. Bond recalled meeting her mother's supervisor, John Gerhardt. She met him after her mother's first injury. Ms. Bond said she and her mother had gone to the company to give him and Deborah Junkin the excuse slips and other documents. She said Mr. Gerhardt walked over to her mother, picked up her

crutches and threw them in the garbage. He told her mother that she did not need the crutches because she was not hurt. She said one of the ladies there retrieved the crutches and gave them back to her mother. Ms. Bond testified that the only other time she went to Raytheon was to turn in her mother's uniforms and keys.

¶18. On cross-examination, Ms. Bond testified that she was aware that her mother had had a motor vehicle accident in August of 1997. She said her mother had bruises across her chest and that she was taken to the emergency room.

¶19. The parties stipulated to the testimony of Miller's daughter, Rachel Conner. Ms. Conner's testimony corroborates that of Stacy Nowell and Tammy Bond.

¶20. Deborah Junkin testified that she was the personnel supervisor for Raytheon. She said Dyna Corp took over the contract from Raytheon before the hearing. Ms. Junkin said she still operates in the same capacity with the current employer that she operated at under Raytheon. Ms. Junkin testified that she worked on Miller's workers' compensation claim and that she received a fax from David Owen, attorney for Miller, on or about August 6, 1996. The fax stated that Miller was to be off work from August 6, 1996 through August 13, 1996 and would return on August 14, 1996. She gave this document to her supervisor, Jon Horton. Ms. Junkin testified that she received a second fax from David Owen's office stating that Miller was to be off work from August 14, 1996 through August 18, 1996. The second fax stated that Miller was capable of returning to work on August 19, 1996.

¶21. Ms. Junkin said no one in David Owen's office informed her that Miller had suffered a second injury. When records came to her from Dr. Stanback's office, they were not marked "workers' compensation" so she assumed that Miller was seeing Dr. Stanback for a condition unrelated to work. Ms. Junkin said she took the documents to Mr. Horton so he could notify Mr. Gerhardt.

¶22. Ms. Junkin testified that the company has a collective bargaining agreement that dictates the rules an employee must follow in reporting absences. This was handled by the contract resource manager, who was her supervisor. Ms. Junkin said based on Miller's excuse slip it was acceptable for her to be off work at Raytheon until at least August 19,1996. Ms. Junkin said the only medical records that she had knowledge of were those regarding Miller's May 8, 1996 injuries. However, she was aware of the return-to-work slip from Dr. Carro dated July 31, 1996, allowing Miller to return to work on August 1, 1996.

¶23. Ms. Junkin testified that before August 5, 1996, Miller brought in all slips from any doctor concerning her work-related injuries. Ms. Junkin also testified that as part of her job, she receives slips from everybody regarding nonwork-related injuries, and work-related injuries. She testified that at no time did Miller ever tell her of any injury other than the one on May 8, 1996.

¶24. The records of Dr. Scott Jones were submitted by affidavit. Dr. Jones first saw Miller on or about May 15, 1996. He noted that Miller had fallen and injured her left knee and right hand. She had tenderness of the knee and some limited range of motion. X-rays showed mild arthritis. Dr. Jones's impression was right hand strain and left knee strain. He recommended physical therapy and that she could return to work on May 15, 1996, with restrictions of no forceful repetitive grasping of the hand. He noted that she needed to be sitting due to the pain and discomfort to her knee. Miller returned to see Dr. Jones on May 29, 1996. She had a medial lateral support brace that was helping with her knee. She only had mild medial tenderness. Her wrist was doing well with good range of motion and some mild decreased grip strength. At that time, Dr. Jones released Miller to full-duty work with instructions to return to see him in one month. She returned

to see Dr. Jones on or about June 4, 1996. Dr. Jones noted that she had pretty good range of motion with the wrist, but no evidence of swelling. She did have some nonspecific tenderness and her grip strength was decreased. Her left knee showed good range of motion with no effusion. However, she had diffused tenderness about the knee. Dr. Jones still felt this was a knee strain and wrist strain that seemed to be improving. He felt she should be back to work. He spoke with the employer and they agreed to return her to work with the restriction of no lifting more than twenty pounds, and she was to start back the following day.

¶25. The records of Dr. John Gassaway were submitted by affidavit. Miller first saw Dr. Gassaway on or about June 12, 1996. She reported a date of injury of May 7, 1996. Dr. Gassaway noted that she had been approved by workers' compensation for a second opinion. She reported left knee and right-hand pain. She did not have any of her records so she returned to Dr. Gassaway on June 19, 1996. She reported that she had been at work and fell between a door and a steel table. She saw Dr. Bruce Jones, who referred her to Dr. Scott Jones. X-rays were done, and she was diagnosed with a bruised bone and strained left knee and underwent physical therapy. She reported that she could not pick up any equipment at work and she had increased pain in her right hand and back. Dr. Gassaway noted that she did not put forth full effort on her examination and did not give any effort on range of motion on her knee. He could not be sure whether or not she had any problems. Dr. Gassaway noted that he could detect no swelling. Further, he had reviewed x-rays and had seen no evidence of fracture of her hand or patella. Dr. Gassaway's diagnosis was "contusion left knee and low back strain." He recommended that she should continue therapy and follow up with Dr. Jones.

¶26. Dr. Riley Jones testified by deposition. Dr. Jones stated that he had examined Miller on June 2, 1998, at the request of the employer and carrier. Dr. Jones obtained a history. Miller reported that she was injured on or about May 7, 1996. She reported that she fell at work when she tripped over a uniform rack. She denied any loss of consciousness. She fell on her right hand and back and hit the floor with her knees. She was then followed up in the emergency room and given a brace for her left knee. Dr. Jones noted that the claimant had a left knee bruise and was seen by an orthopaedic surgeon, who released her to go back to work. She stated that she had not been back to work because she could not bear weight on her left knee. She reported chronic pain in her low back radiating down to the left lower extremity. She also complained of increased pain in her right hand, mainly to the second and third fingers of the right hand. At that point, Miller had an MRI, which was negative for disk herniation, spinal stenosis or significant intraforaminal abnormalities on either side. Her knee showed a small cyst that was otherwise negative. She also had a bone scan, which was negative. Dr. Jones noted that she had been released by Dr. Carro at MMI with no restrictions and had been followed by her family physician, Dr. Stanback. Dr. Jones's diagnosis was chronic low back pain, etiology undetermined. At that time, Dr. Jones felt she had multiple inconsistencies. He noted that nothing fit any definite pattern, and that it appeared to be mostly non-physiological. From an orthopaedic standpoint, he did not find anything of great consistency. He felt it would be interesting to have an EMG of the lower extremity for completeness sake, but she had a thorough work-up otherwise.

¶27. Jerry Burns testified by way of deposition taken on May 15, 1997. Mr. Burns testified that at that time he had been an employee of Raytheon at the Columbus Air Force Base for almost three years. He testified that he was moving to Dothan, Alabama the next week. His job at Raytheon was maintenance control technician, and he normally worked third shift. Mr. Burns testified that he recalled working with Miller. He also remembered her being injured in May of 1996. He recalled her being brought in so that she could

report the accident to Ken Zaremba, who was the supervisor for the base on third shift. Mr. Burns remembered her being taken to the hospital by Mr. Zaremba. It was Mr. Burns's understanding that she had "tripped over some wiring and fell and hurt her knee or something." He remembered that he saw her on one or two occasions after the May 1996 accident. He believed one was in August of 1996. As he recalled, she had to turn her keys in upon leaving work. This was normally around 6:00 or 6:30. She discussed with him that she was upset by the way she was being treated by her peers and supervisor. He did not recall her ever indicating that she had had another accident. Mr. Burns testified that the only accident he remembers her having between May and August of 1996 was when she injured her left knee. Mr. Burns testified that this conversation occurred on the last morning that she worked.

¶28. On cross-examination, Mr. Burns testified that if Miller had gotten injured during the third shift, the proper reporting procedure would have been to notify MOC. Mr. Burns testified that even if she was not physically able to get to him, she should have at the least called to notify him that she had been injured while on third shift. However, Mr. Burns further testified that he had no reason to doubt that she was telling he truth and that she could have sustained injuries that he did not know about.

¶29. Eugene Colley testified by way of deposition taken on May 28, 1997. He testified that he was employed at Raytheon as a canopy rigger on the third shift. Mr. Colley testified that he performed this job in May, June, July and August of 1996. He testified that he worked with Miller during that time and was aware that she had been hurt. Mr. Colley acknowledged that he did not see her get injured, but that he did discuss it with her occasionally. It was his understanding that she had hurt her left knee, but he did not discuss that specifically with her. He did note that every time he saw her, she was doing her job.

¶30. On cross-examination, Mr. Colley testified that if an employee is injured, that employee should fill out an injury report with the MOC. He also testified on cross-examination that the only injury Miller discussed with him was the injury to her left knee. He said she never mentioned any problems with her back and he was not aware of her ever suffering any second injury. Further, he had not heard any "scuttle" from any of the other employees about a second injury. Mr. Colley testified, however, that he thought of her "kind of like a grandmother" and he had no reason to believe that she was not telling the truth.

¶31. John Browning testified by way of deposition taken on May 28, 1997. Mr. Browning testified that he worked at Raytheon primarily on third shift as an aircraft mechanic. He noticed at one time Miller was limping and asked if she had been injured. She reported that she had. Mr. Browning testified that the conversation occurred some point in time after she had been injured and returned to work. Mr. Browning testified that he was only aware of her having one injury. He was also only aware that she had injured her knee. He did testify that if an injury occurred on mid-shift that it should have been reported to the MOC.

¶32. Ruthie Williams testified by way of deposition taken on May 28, 1997. Ms. Williams testified that at that time she was in training as an aircraft servicer for Raytheon. She had been a custodian. Ms. Williams testified that when she was a custodian in 1996, she worked first shift for six months and third shift for six months. She knew Miller and had worked with her on occasions. She also testified that they were friends. Ms. Williams testified that she remembered Miller being moved from first shift to third shift some time in April of 1996. Ms. Williams further testified that she switched to third shift at the request of Miller. However, when company officials told her that the switch would have to be for a year, she requested to go back to first shift. Ms. Williams testified that in April of 1996 they switched her to first shift. There was also a general custodian change at that time and Miller began working nights. Ms. Williams testified that she was

aware that Miller had an injury in May of 1996. Further, she had conversations with her about working different shifts and about her injury. Ms. Williams testified that during one conversation that she had with her before her injury, Miller asked her to switch to third shift so that they could work together. However, she told her that she wanted to work days. At that point, Miller told her that she was going to a doctor on base to see if they would check her blood pressure, because working third shift was running her blood pressure up. Ms. Williams further testified that Miller also stated that she would find a way to get out of working third shift, if it was the last thing she did.

¶33. Ms. Williams testified that the first time she saw Miller after her injury was at the mall the following Sunday. At that time, she was walking into a drug store. She testified that Miller did not have a limp and she did not notice anything wrong with her.

¶34. Ms. Williams recalled having a conversation with Miller about returning to work. She said Miller told her she was going to find a way to get out of working for those "SOB's" and they were going to have to pay regardless. She again stated that she was not going to work third shift. Ms. Williams said she told Miller that she should return to work. Ms. Williams testified that she had another conversation with Miller in February of 1997 when she called her at home to talk to her. Miller stated that she was not going to come back to work, that she did not have to put up with the "bull" and that she was going to get paid. Ms. Williams also stated that she had seen her a couple of times since January of 1997 at Wal-Mart. Ms. Williams said when she saw her the first time, Miller did not see her. Miller was walking without a limp. Ms. Williams also said that she had driven by Miller's house and had seen her exiting her car. Ms. Williams stated that she had never discussed with Miller having been injured in August of 1996.

¶35. On cross-examination, Ms. Williams testified that Miller told her once that she had fallen when she was trying to help her husband, who had fallen. She stated that after that, the claimant always had a problem because she stated she was hurting. However, Miller continued to do her job duties. Ms. Williams testified that at the time Miller worked for Raytheon they were friends. However, Miller no longer wanted to talk to her. Ms. Williams stated that it was her impression that Miller did not want to talk to her anymore because Miller felt she was spying on her for the company. Ms Williams stated that she was not. She did acknowledge that after Miller's May 8, 1996 injury she went by her house, and she was on the couch with her knee bandaged. Ms. Williams testified that she did not believe Miller was really in pain because she had been by her house earlier that afternoon. She knocked on the door but at first nobody answered. She stated that she knocked again, but nobody answered. Finally, she heard somebody walking through the house and in a few minutes, she went in and Miller was back on the couch again.

¶36. Eva McMinn testified by deposition taken on May 28, 1997. Ms. McMinn testified that she had been employed at Raytheon from June 11, 1996 through September of 1996. She was hired as a custodian but later became an aircraft washer. Ms. McMinn worked third shift when she was a custodian. Ms McMinn said she worked with Miller once sometime in August of 1996. She said they worked the entire shift together. She remembered this because when she pulled up to park her car, there was a woman, who said she was Ora Miller and was there to work. Ms. McMinn said she knew nothing about this because she was under the impression Miller had been out on sick leave. She went to get her timecard and found a note from John Gerhardt stating that he had talked to Miller that day and that she was coming back to work that night. They were working with a third woman named Tracy Williams. She also stated that they were to pick up Miller's garbage for her that night. Ms. McMinn stated that she and Tracy worked together that night and they "dropped" Miller off at her building. They did go by later to pick up her trash and saw her vacuuming in

an office. Ms. McMinn testified that she saw Miller on two other occasions that night. She stated that they went to pick up her garbage at hanger six and saw her in the hanger six break room wiping down the big break tables. Ms. McMinn testified that this would have been some time between 5:00 and 6:00 a.m. She stated that the last time she saw Miller was approximately 6:00 or 6:30 a.m. when she came to clock out. Miller went in to clock out, and then she came out and went to the parking lot. Miller's car was parked over by hanger two which was directly across from the custodial shack. Miller said "bye, see ya," and left. Ms. McMinn testified that she has never seen her since then. Ms. McMinn stated that when Miller clocked out, she did not notice anything wrong with her.

¶37. On cross-examination, Ms. McMinn testified that she saw Miller wiping down the tables in hanger six some time between 5:00 a.m. and 5:30 a.m. She testified that Mr. Gerhardt normally arrived at a quarter until six. Ms. McMinn testified that she was never aware of Miller having suffered a second injury while working at Raytheon.

¶38. John Gerhardt testified by deposition taken on May 28, 1997. Mr. Gerhardt was retired from Raytheon. He stated that he retired on October 25, 1996. At the time he retired, he was employed as a government property specialist. His job entailed supervising custodians. Mr. Gerhardt testified that he hired Miller to do custodial services. He said she initially worked first shift, but was later switched to third shift. Mr. Gerhardt testified that he recalled when she had her alleged first injury, because it was reported to him the following morning. He denied that Miller ever reported a second injury to him.

¶39. Mr. Gerhardt testified that he conferred with Jon Horton about what they were to do after Miller quit coming to work after August 6, 1996. He stated that he did call her at Mr. Horton's request about her providing medical excuses for any days that she was supposed to be off. He testified that he never received any faxes from David Owen's office for the claimant to be off work. Mr. Gerhardt specifically denied that Miller ever told him that she was injured in August of 1996 while pulling a buffer.

¶40. Dr. Charles Stanback, family practitioner, testified in this matter twice by deposition. The first deposition was taken September 23, 1997. Dr. Stanback testified that he saw Miller on or about August 6, 1996. She complained of back and hip pain, radiating down the leg. It had started that morning. His records showed that she had fallen at work on May 8, 1996. Dr. Stanback testified that she received treatment for low back strain. He testified that she had been released to go back to work and then had a subsequent fall at work that he believed occurred the day after she went back to work. Dr. Stanback prescribed medication. She returned to see him on August 14, 1996. At that time, she was improving but still having pain in her back. He then saw her again on August 19 and she was put on medication.

¶41. Dr. Stanback testified that Miller was involved in a motor vehicle accident on or about August 20, 1997. He noted that she had no broken bones. She had soreness in her chest and neck and her left knee was contused and hurting. Dr. Stanback saw her for follow-up on September 3 and noted that she had bruising and still had knee pain, but was improving. Dr. Stanback testified that he wrote a letter "To Whom It May Concern" on or about September 9, 1996. The letter stated that Miller had lower lumbar strain with pain radiating to her leg. Miller was unable to work at that time, and he could not predict when she would be able to return to work. Dr. Stanback also testified about a March 12, 1997 letter he had written to "To Whom It May Concern" to say that he had been treating Miller and felt that she was not able to function normally. He felt she would not be able to bend, stoop, lift, hold heavy weights or anything that would be required on her job. Dr. Stanback testified that the only objective finding he noted during any of his

evaluation was muscle spasms in her back. It was Dr. Stanback's opinion that her second fall aggravated her injury from her first fall.

¶42. On cross-examination, Dr. Stanback testified that it was a standard procedure to take notes while he was examining his patients. Dr. Stanback acknowledged that his note from August 6, 1996 stated that Miller had fallen on May 8 at work. He admitted that he never wrote down any history of the alleged second fall at work. However, he had talked with her "concerning all these things." Dr. Stanback testified that he was aware that other doctors had treated Miller but had not seen any records of any other doctor when he saw her on August 6, 1996. Also, Dr. Stanback admitted that as of his deposition on September 3, 1996, he still had not seen any records from any other physician except a report of Dr. Manuel Carro dated May 13, 1997. Dr. Stanback testified that the only diagnosis he made relating to her work injuries was lumbar strain and causalgia. Dr. Stanback did acknowledge that he did neurological examinations of Miller's back. He testified that every examination was normal. Dr. Stanback testified that her motor vehicle accident of August 20, 1997 caused injuries to her chest and left knee. Dr. Stanback had told Miller that if she were having any more problems that she should come back to see him, but as of the deposition, no return visit had been scheduled. Dr. Stanback was also of the opinion that she had reached maximum medical improvement from her work injuries but not from her motor vehicle accident. However, Dr. Stanback was unable to assign any specific date of maximum medical improvement, other than it occurred sometime before her motor vehicle accident of August 20, 1997. Dr. Stanback also testified that when he gave her restrictions in the March 13, 1997 letter, that he would define heavy lifting as anything more than twenty-five pounds. He stated that bending and stooping was not to be done on a repetitive basis.

¶43. Dr. Stanback was deposed a second time on March 18, 1998. Dr. Stanback testified that he had treated Miller following a motor vehicle accident. He saw Miller on August 20, 1997. Dr. Stanback testified that he had seen her the day before the deposition, which would have been March 17, 1998. Dr. Stanback testified that he had some mistakes in the notes he had written back on August 20, 1997. Dr. Stanback testified "she fell once back in May, I believe, or June, and hurt her knee. Her left knee and right - her right knee and her left arm or vice versa. She reached in the closet to pull out a buffer on August 6 and hurt her back, she had a back strain. These two things are separate injuries on-the-job." Dr. Stanback said that he had taken notes from the March 17, 1998 visit and that he had jotted down information. However, he was unable to find the note. He stated that he had gotten her history of two different on-the-job injuries and written them on a prescription pad, which he was unable to find as of the time of the deposition.

¶44. When questioned in more detail about his discussion with Miller on March 17, 1998, Dr. Stanback said it was his understanding that when she fell the first time at work the only thing she hurt was her knee and her arm. It was his understanding that when she was hurt in August that she strained her back. Dr. Stanback testified that when she had the motor vehicle accident that she had multiple contusions and possibly muscle strains or "something." He also acknowledged that she reported problems with her chest, neck and left knee. Dr. Stanback acknowledged that when he saw her for follow up on September 3 that her knee was still hurting. Dr. Stanback testified that as of September 17, 1997, she was released to return to work or "whatever" from the motor vehicle accident.

¶45. Dr. Stanback continued to treat Miller through January 5, 1998, for left leg and low back pain. At that visit, he informed her that she was 100% disabled due to her on-the-job injuries. At this point, Dr. Stanback acknowledged that in his previous deposition, he had given her restrictions of no bending, stooping, lifting or holding any weight and that heavy weights meant twenty-five pounds. In his current

deposition, Dr. Stanback stated that heavy weight meant that she could not lift anything. It was his opinion that she could not even lift up to twenty-five pounds. He stated that in his opinion that she could not do any stooping, bending or lifting of any kind. Dr. Stanback testified that all of this was work-related and had nothing to do with the motor vehicle accident. Dr. Stanback also testified that he is unable to say whether or not she even hurt her knee in the motor vehicle accident. Dr. Stanback went on to testify that the reason he felt on January 5, 1998, that she was 100% disabled was due to her back and her left knee.

¶46. Miller also submitted affidavits from Baptist Memorial Hospital-Golden Triangle. These records show that she was seen at the emergency room on or about August 18, 1997, as a passenger in a motor vehicle accident. She was complaining of chest pains. She also reported that she was tender in her left knee. X-rays of the left knee were taken and shown to be negative except some degenerative spurring about the knee. The emergency room records show that they also saw her on May 8, 1996. She had fallen at work and injured her left knee and right middle finger. They referred her to Dr. Scott Jones. X-rays at that time were negative except some osteoarthritic spurring.

¶47. Dr. Manuel F. Carro testified by deposition of October 17, 1997. Dr. Carro is board-certified in physical medicine and rehabilitation. He first saw Miller on June 24, 1996. She reported that she had a work-related injury on May 7, 1996. She fell on her right hand and back and her knees hit the floor. Her main complaints were of her left knee. She reported chronic pain in the low back radiating down the left lower extremity. The claimant's left knee at that time showed no swelling. She did have some nonphysiological findings at that time. Dr. Carro ordered an MRI of her low back, and MRI of her left knee, a bone scan and x-rays of the right hand, lumbar spine and left knee. Dr. Carro's opinion was that these problems were related to her on-the-job injury of May 7, 1996. Dr. Carro testified that her lumbar MRI was normal and that the MRI of her left knee showed evidence of a small popliteal cyst. The bone scan was normal except for some contramalacia arthritis of her knees. Dr. Carro felt that she had a mild bruise to her left knee or left knee strain. X-rays of her right hand, left knee and lumbar were essentially normal. She returned to see Dr. Carro July 3, 1996. She still reported pain in her back, right hand and left knee. At the time, Dr. Carro's diagnosis was lumbar myofacial strain and left knee strain. He recommended physical therapy. He kept her off work for two weeks.

¶48. Dr. Carro testified that Miller returned to see him on or about July 17, 1996. At that time, she had only two sessions of physical therapy. She apparently had some conflict with scheduling her appointments. She still had pain in her knee and reported low back pain. She did have trigger points in her low back. Dr. Carro testified that those are usually the result of a muscle strain or pull. Dr. Carro injected her back, prescribed more physical therapy and told her to return in two weeks. She did return to see Dr. Carro July 31, 1996. At that time, her left knee had improved, as well as her low back and right hand. She still had some pain in the forsum of the right hand. Straight leg raising was normal, and she had no instability of the knee. She limped, but Dr. Carro could not find any deficits. Dr. Carro explained to her that she had a work up that was essentially normal for significant pathology and he was releasing her back to work with no restrictions. He felt that she had reached maximum medical improvement. Dr. Carro testified that she did return to see him on May 13, 1997. At that time, she reported that she sustained a second injury. Dr. Carro stated that he did not give her an impairment rating because he was not her doctor for her second injury.

¶49. On cross-examination, Dr. Carro testified that he did examine Miller when he saw her on May 13, 1997. He testified that she had a normal neurological examination. She did have trigger points in her spine. Dr. Carro testified that all the diagnostic testing he had done as of July 31, 1996, was normal except the

cyst, which he said was not traumatic. Dr. Carro testified that when he saw her on May 13, 1997, and she reported the second injury, she related that the only injury was to her back. However, he noted that when he did see the claimant on May 13, he did examine the left knee and that there had been no change in the left knee from his previous examination on July 31, 1996. He also testified that there were no changes in her back examination from July 31, 1996 through May 12, 1997. He further acknowledged that on July 31, 1996 he released her to return to work and that she had no restrictions. Dr. Carro went on to testify that because he had not been specifically asked about her return to work, he did not address that in his May 12, 1997, records. Dr. Carro could not say that he would have released her to return to work. Dr. Carro acknowledged that he issued a letter of June 6, 1997, to her counsel. In that letter, he stated "There has been no change in her condition since previous evaluation. I relate my diagnosis to her first injury. Ms. Miller reached maximum medical improvement for her first injury on July 31, 1996 with no restrictions and no impairment rating. I cannot determine restrictions or impairment rating for her second injury, since I was not the treating physician." Dr. Carro's return-to-work slip was made an exhibit. That slip stated that as of July 31, 1996, she was released to return to work on August 1, 1996, with no limitations.

¶50. At the hearing in this matter on October 6, 1999, the report of Dr. Stanback was offered into evidence. The employer and carrier objected to the admission of this document. However, it was admitted into evidence by agreement between the parties that the last sentence on the first page of the document be stricken. Dr. Stanback's October 6, 1999 letter provides that he has treated Miller for "both of her on-the-job injuries she sustained while working at the Columbus Air Force Base for Raytheon." It also provides that Miller is "incapable of performing any job duties that would require her to stand for a period of over 5 minutes time, stoop, walk or bend without intense pain." Dr. Stanback notes that he believes her condition will continue to deteriorate and he cannot offer her anything more than "palliative care" in an effort to relieve her pain.

¶51. The report of Sam Cox, Vocational/Rehabilitation expert retained by the employer and carrier, were offered into evidence as an exhibit. This report is dated September 29, 1998. Mr. Cox's report notes that his evaluation and job search takes into consideration Miller's education, work history, and physical restrictions. It is the opinion of Mr. Cox that she is employable. In this report he identified approximately seventeen jobs that he felt she was qualified to do ranging from $5.15 an hour to $8.00 an hour. These jobs were in the Starkville-Columbus, Mississippi area. They range from being a desk clerk, a machine operator, a dispatcher and a security guard at hotels, restaurants, hospitals and other employers in the Golden Triangle area.

¶52. Faxes from David Owen's office to "Debra" at Raytheon dated August 6, 1996, and "Jon Horton" dated August 27, 1996, were offered into evidence. Attached to the August 6 fax was a certificate to return to work from Dr. Stanback stating that Miller had been under his care from August 6, 1996 through August 13, 1996, and could return to work on August 14, 1996. Attached to the August 27 fax was a two page letter from David Owen, Miller's attorney, that indicated he was aware that she had been terminated. This letter acknowledged that Deborah at Raytheon was provided an excuse from Dr. Stanback on August 14, 1996, stating that she would be off work until at least August 19, 1996. Mr. Owen went on to state that she was unable to work, and Raytheon should immediately start paying her temporary total disability benefits until she was released. He stated that she would be out until September 3, 1996, and if benefits had not been paid, he would pursue legal action against Raytheon.

¶53. A composite exhibit was offered into evidence consisting of a certificate from Dr. Stanback allowing

Miller to return to work on August 14, 1996; a second certificate allowing her to be off work from August 14, 1996 through August 18, 1996 and to return to work on August 19, 1996; a letter from Dr. Stanback dated September 9, 1996, stating that she was unable to work and that he would not predict when she would be able to return; and a letter from Dr. Stanback dated March 13, 1997, stating that he did not believe she would be able to continue a gainful employment.

¶54. Letters of reprimand, suspension and discharge were also offered into evidence. A letter dated August 8, 1996, stated that Miller failed to report to work on August 6 and 7 and did not notify her supervisor. She was suspended for five days through August 14, 1996. She received a discharge letter on or about August 22, 1996, stating that she had failed to return to work on August 15, 1996, from her suspension and had not notified her immediate supervisor.

¶55. A September 4, 1996, letter to Miller from Jon Horton regarding her termination was offered into evidence as an exhibit. The letter states that it is to clarify his letter of August 22, 1996. Mr. Horton stated that they had terminated her employment due to her failure to report to work for three consecutive days on August 19, 20 and 21 without proper notification in accordance with the company handbook.

## STATEMENT OF THE RAYTHEON ISSUES

**I. WHETHER A CIRCUIT COURT CAN OVERTURN A FINAL ORDER OF THE MISSISSIPPI WORKERS' COMPENSATION COMMISSION ABSENT A FINDING THAT THE FULL COMMISSION'S ORDER WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE OR THAT THE ORDER WAS BASED UPON AN ERRONEOUS INTERPRETATION OF THE LAW.**

**II. WHETHER THE CIRCUIT COURT ERRED AS A MATTER OF LAW IN REFUSING TO RECOGNIZE THE FULL COMMISSION AS THE ULTIMATE TRIER OF FACT IN WORKERS' COMPENSATION CASES.**

**III. WHETHER THE RULING OF THE FULL COMMISSION WAS SUPPORTED BY SUBSTANTIAL EVIDENCE.**

## STANDARD OF REVIEW

¶56. Appellate review of compensation cases has been clearly stated. The Mississippi Supreme Court has stated, "[t]hat the findings and order of the Workers' Compensation Commission are binding on the court so long as they are 'supported by substantial evidence.'" *Liberty Mutual Ins. Co. v. Holliman*, 765 So. 2d 564 (¶6) (Miss. Ct. App. 2000) (quoting *Vance v. Twin River Homes, Inc.*, 641 So. 2d 1176. 1180 (Miss. 1994)). The Commission's order will be reversed only if the court finds that the order was clearly erroneous and contrary to the overwhelming weight of the evidence. *Liberty Mutual Ins. Co.*, 765 So. 2d at (¶6). "A finding is clearly erroneous when, although there is some slight evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made by the Commission in its findings of fact and in its application of the Act." *J. R. Logging v. Halford*, 765 So. 2d 580 (¶12) (Miss. Ct. App. 2000). "Where no evidence or only a scintilla of evidence supports a Worker's Compensation Commission decision, this Court does not hesitate to reverse." *Metal Trims Industries, Inc. v. Stovall*, 562 So. 2d 1293 (Miss. 1990) (citing *Universal Mfg. Co. v. Barlow*, 260 So. 2d 827 (Miss. 1972)). This Court gives liberal construction to the compensation statutes and where a

question may exist, this Court will often rule in favor of the claimant. *Big '2' Engine Rebuilders v. Freeman*, 379 So. 2d 888, 889-90 (Miss. 1980).

## DISCUSSION

¶57. The issues asserted in this appeal question the circuit court's treatment of the Commission's findings. Since this is the central issue, we address all issues simultaneously. Raytheon does not contest the first injury, but vehemently denies the second injury occurred notwithstanding any substantial evidence to the contrary. Raytheon argues in this appeal that the circuit court was in error when it substituted its finding for those of the Commission. Raytheon also argues that substantial evidence did exist to support the order of the Commission, and that the Commission's order should be reinstated by this Court.

¶58. The circuit court's duty in reviewing the Commission was to search only for clear errors. *J. R. Logging*, 765 So. 2d 580, 584 (¶15) (Miss. 2000). Pursuant to its standard of review, the circuit court may only alter the Commission's findings if, although there may be some slight evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made by the Commission. *Id.* The circuit court found that the Commission's order was clearly erroneous, was not supported by any substantial evidence, and was contrary to the substantial evidence. This Court must overturn the Commission's decision when it is clearly erroneous, manifestly wrong, and contrary to the overwhelming weight of the evidence. *See Nettles v. Gulf City Fisheries, Inc.*, 629 So. 2d 554, 557 (Miss. 1993); *McGowan v. Orleans Furniture, Inc.*, 586 So. 2d 163, 165 (Miss. 1991); *Hudson v. Keystone Seneca Wire Cloth Co.*, 482 So. 2d 226, 227 (Miss. 1986). This Court will not merely "rubber stamp" the Commission's actions. "Where no evidence or only a scintilla of evidence supports a Workers' Compensation Commission decision, this Court does not hesitate to reverse." *Metal Trims Industries, Inc. v. Stovall*, 562 So. 2d 1293 (Miss. 1990) (citing *Universal Mfg. Co. v. Barlow*, 260 So. 2d 827 (Miss. 1972)).

¶59. The first injury of May 8, 1996, is not at issue. Raytheon admitted it was a compensable injury and paid all benefits due Miller resulting from the injury. Miller was taken to the emergency room for her injury. She was referred to Dr. Scott Jones, an orthopaedist, and to Dr. Gassaway for an independent medical exam (IME). She was also referred to Dr. Carro who then became her treating physician. All of these doctors ultimately released her to return to work without any medical impairment rating or physical limitations. Neither Dr. Scott Jones nor Dr. Gassaway treated Miller for injuries sustained in her second injury. Thus, their testimony is not relevant to the second injury. Dr. Carro only saw her one time after the second injury and deferred any opinion to Miller's usual treating physician.

¶60. The issue of the second injury of August 6, 1996, is the crux of this case. Miller worked the third shift and she was injured in the early morning hours on that shift. Raytheon denies it happened but Miller stated numerous times in her testimony how she was injured and to whom she reported the injury. She stated emphatically she reported the injury to Mr. Gerhardt shortly after her injury. She stated "he just looked at me and walked into the office." The notes of Drs. Stanback and Carro contain a history of the second injury.

¶61. John Gerhardt, whose deposition was admitted in lieu of being present at the trial, denied that Miller reported the second injury. He also denied receiving faxes from Miller's attorney which were medical excuses from Dr. Stanback. Debra Junkin, personnel supervisor for Raytheon, stated she received the faxes from the attorney and gave them to her supervisor, Jon Horton, so he could notify John Gerhardt. The faxes

stated Miller was to be off work from August 6, 1996, and eventually return to work on August 19, 1996. Miller was thereafter suspended and eventually terminated by Raytheon. The credibility of Mr. Gerhardt is very much in question because he denies Miller reported the second injury to him and even denies receiving the faxes the personnel supervisor said he was to receive. These denials are from the same individual who tossed away the crutches of Miller when she attempted to return to work with light duty restrictions resulting from the first injury.

¶62. Jerry Burns and Eugene Colley testified by deposition for Raytheon. Neither of these individuals had any personal knowledge of the second injury but they had no reason to doubt that she was telling the truth. Colley even stated Miller was kind of like a grandmother. Raytheon called several other witnesses but none of them had any personal knowledge of the second injury. One of the witnesses, Ruthie Williams, was at one time a close friend of Miller. However, they later accused each other of work related misconduct and were no longer friends at the time of the hearing. Thus, her testimony has no credibility.

¶63. Miller's daughter, Tammy Bond, testified her mother was in great pain when she first saw her at home on the morning of the accident. She had to assist her to the car to take her back to Dr. Stanback. Her son, Stacey Nowell, testified her back pain appeared to be much worse after her return to work on the night of August 5, 1996. The parties stipulated that the testimony of another daughter, Rachel Conner, would be the same as Bond and Nowell. The evidence is overwhelming that Miller sustained a second injury to her back and the Commission was manifestly wrong in deciding otherwise.

¶64. We now examine the issue of the extent of Miller's injury to her back resulting from the second injury, if any. Miller contends her medical proof is sufficient to support her total disability award by the administrative law judge and the circuit court. Likewise, Raytheon contends the Commission's order should be reinstated because it was supported by substantial evidence.

¶65. After the second injury, Miller saw Dr. Stanback, a general practitioner who had treated her in the past. He saw her twenty-seven times during the course of his treatment which covered a three and one half year period. He saw her initially on the day of the second injury and she was complaining of back and hip pain. Dr. Stanback testified by deposition on two occasions and presented a letter dated October 6, 1999, six days before the hearing. Raytheon submits that because Dr. Stanback did not specifically mention the August injury as the precipitating event for the back injury, that the second injury did not occur. Dr. Stanback admitted his office notes were sketchy but he testified Miller told him she injured her back the day she returned to work. He stated that on the January 5, 1998 visit Miller could not do any stooping, bending or lifting of any kind. He further stated she was 100% disabled due to her back and left knee injuries resulting from her on the job injuries with Raytheon.

¶66. The only other physician who treated Miller for her second injury was Dr. Carro. He saw her only on one occasion on May 13, 1997. At that time, Miller reported to him she sustained a second injury and it was to her back. He stated he could not say that he would have released her to return to work because he was not asked to address that issue. He would not address the issue of impairment rating for her second injury because he was not her treating physician and deferred such to her treating physician, Dr. Stanback.

¶67. Raytheon referred Miller to Dr. Riley Jones, an orthopaedist for an independent medical exam after the second injury. This date was approximately sixteen months prior to the hearing. He stated from an orthopaedic standpoint, he did not find anything of great consistency. He did recommend an EMG of her lower extremity for completeness but this apparently was never done.

¶68. In summary, we have three physicians who saw Miller for injuries arising out of her second work related injury with Raytheon. Raytheon's orthopaedist does not find anything of great consistency. The date of his exam was many months prior to the hearing and she was seen numerous times by Dr. Stanback after the independent medical exam. Dr. Carro deferred his opinion as it related to impairment rating and disability to her treating physician. Dr. Stanback, as her treating physician, opined that Miller was totally disabled.

¶69. While there is some evidence that Miller's injuries are not disabling, the overwhelming evidence supports an award of total disability to Miller. The Commission relied upon the testimony of Dr. Riley Jones and Dr. Carro. Dr. Jones only saw Miller for an independent medical exam many months prior to the hearing. Since he only saw Miller the one time, his opinion is not based upon current information and cannot trump the opinion of her regular treating physician. The other medical evidence introduced relative to the second injury was that of Dr. Carro. Simply stated, he deferred any medical opinion to Dr. Stanback. The reliance by the Commission upon the independent medical exam physician being a specialist was manifestly wrong.

¶70. The supreme court was faced with this same issue in *South Central Bell Telephone Co. v. Aden*, 474 So. 2d 584 (Miss. 1985). In that case, the court was faced with the question of whether or not to prefer the opinion of a specialist over those of a treating physician. In that case, the treating physician had treated the claimant on "nine or ten occasions," for about a year. *Id.* at 593. As here, the IME orthopaedic surgeon, who had seen the claimant one time, stated that the claimant had no findings of great consistency. The *Aden* court stated "[w]e are not about to hold that in order to establish a compensable back injury claim a claimant must support his claim with the testimony of an orthopaedic surgeon." *Id*.

¶71. In *Clements v. Welling Truck Services, Inc*., 739 So. 2d 476, 478 (¶9) (Miss. Ct. App. 1999), the Court stated that the treating physician versus the IME doctor comparison was a "self evident" one. The *Clements* court stated "that treating physicians' opinions carry more weight than those of physicians who examine the claimant solely for purposes of testifying. . . ." *Id.; see also* Larson's *Workers Compensation Law*, Section 80.24(b) n. 83.1 and *Johnson v. Ferguson*, 435 So. 2d 1191 (Miss. 1983).

¶72. Never once, until in its brief to the Commission, did Dr. Stanback's credentials ever come under fire. Dr. Stanback exclusively treated Miller following her second injury. In *Aden*, as here, the treating doctor's credentials were challenged first on appeal. In both cases, the treating physician was "established . . . as a medical expert witness. . . ." The *Aden* court stated that "it is enough that he demonstrate a reasonable lever of expertise. . . ." *Aden*, 474 So. 2d at 593. Dr. Stanback was the physician in the best position to render an opinion of Miller's back injury and disability. Also, "doubtful cases should be resolved in favor of compensation so as to fulfill the beneficial purposes of statutory law." *Miller Transporters, Inc. v. Guthrie*, 554 So. 2d 917, 918 (Miss. 1989). "Because of the broad policy declarations made by the Mississippi Legislature in adopting the Workers' Compensation Act, this Court has given liberal construction to the compensation statutes. Where the matter may be an even question, this Court has found and will likely continue to find in favor of the injured worker." *Jackson v. Bailey*, 234 Miss. 697, 703, 107 So. 2d 593, 595 (1959); *Big '2' Engine Rebuilders v. Freeman*, 379 So. 2d 888, 890 (Miss. 1980).

¶73. This Court must overturn the Commission's decision when it is clearly erroneous, manifestly wrong, and contrary to the overwhelming weight of the evidence. *See Nettles v. Gulf City Fisheries, Inc.,* 629 So. 2d 554, 557 (Miss. 1993); *McGowan v. Orleans Furniture, Inc.*, 586 So. 2d 163, 165 (Miss.

1991); *Hudson v. Keystone Seneca Wire Cloth Co.*, 482 So. 2d 226, 227 (Miss. 1986). We reach the conclusion that the Commission was clearly erroneous in its finding, and that the circuit court properly ruled Miller was permanently and totally disabled.

¶74. This case is remanded to the Commission to determine the amount of benefits due under the provisions of the act.

¶75. **THE JUDGMENT OF THE CIRCUIT COURT OF LOWNDES COUNTY IS AFFIRMED AND REMANDED TO THE COMMISSION FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.**

**KING, P.J., BRIDGES, LEE, AND MYERS, JJ., CONCUR. IRVING, J., CONCURS IN RESULT ONLY. McMILLIN, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY SOUTHWICK, P.J., AND THOMAS, J. CHANDLER, J., NOT PARTICIPATING.**

McMILLIN, C.J., DISSENTING:

¶76. I dissent. The issue upon which this case turns is one of fact and not of law involving the determination of whether the claimant, Ora Miller, did or did not suffer a second job-related injury on the evening she first returned to work from a prior work-connected injury. Under the statutory scheme for compensating injured workers, the Commission sits as the finders of fact. *Inman v. Coca-Cola / Dr. Pepper Bottling Co. of Memphis, Tennessee*, 678 So.2d 992, 993 (Miss. 1996). Once the Commission has accomplished that task, its findings are entitled to substantial deference when challenged in an appeal to the judiciary. *Vance v. Twin River Homes, Inc.*, 641 So.2d 1176, 1180 (Miss. 1994). A reviewing court does not re-weigh the evidence to determine where it might think the preponderance of the evidence might lie, but rather, that court is obligated to affirm the Commission so long as there is substantial evidence in the record to support its determination of disputed questions of fact. *Allen v. Mississippi Emp. Sec. Comm'n,* 639 So.2d 904, 906 (Miss. 1994).

¶77. Multiple witnesses in this case, some of whom would seem to be entirely disinterested, related a version of events on the evening of Miller's alleged second injury that stood in sharp contrast to her version of suff ering an excruciatingly painful injury that left her incapacitated for an hour and then barely able to move about. Co-workers testified to having observed her at intervals during the work period and to seeing her leaving the job under seemingly normal conditions and in no evident distress. Company officials reported that Miller did not contemporaneously report that she had been injured on the job, contradicting her own testimony. In her medical records for treatment occurring after the alleged second injury, there is no indication that she gave a history of a second accident except in the testimony of Dr. Stanback offered in his second deposition. This second deposition was, in material ways, contradicted by his earlier deposition and was not corroborated by his medical notes made at the time of the actual examination.

¶78. On those facts, the Commission determined that Miller had failed in her burden to prove a second work-related injury. It is beyond question that the burden of proof on the issue rested with Miller. *South Mississippi Elec. Power Ass'n v. Graham*, 587 So.2d 291, 294 (Miss. 1991). There was more than substantial evidence in the record to support the Commission's determination. In that situation, I am of the view that the circuit court erred by merely substituting its own view as to the credibility of the witnesses for

that of the Commission. This Court compounds the problem by repeating that same error. We exceed our limited mandate regarding the scope of our review of an administrative proceeding when we do so. *Ray v. Mississippi State Bd. of Health*, 598 So.2d 760, 764 (Miss. 1992).

¶79. I would reverse the judgment of the circuit court. This would reinstate the decision of the Commission. I would do so on the basis that there is substantial evidence in the record to support the Commission's resolution of the key disputed issue of fact on which the case turns.

**SOUTHWICK, P.J., AND THOMAS, J., JOIN THIS SEPARATE WRITTEN OPINION.**

1. The facts stated herein are adopted as set out in the order of the Administrative Law Judge in this case except for minor changes.